UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

ROHAN RAMCHANDANI,        :  Civil Action No.  1:19-cv-9124
                      :
              Plaintiff,    :
                      :  COMPLAINT
              v.          :
                      :  JURY TRIAL DEMANDED
                      :
CITIGROUP, INC, CITICORP and CITIBANK,  :
NATIONAL ASSOCIATION,      :
                      :
             Defendants.   :
                      :
                      :
                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff Rohan Ramchandani ("Ramchandani" or "Plaintiff"), by and through his undersigned attorneys, as and for his complaint ("Complaint") herein, hereby alleges against defendant Citigroup, Inc., Citicorp and Citibank, National Association (collectively, "Citi," the "Company" or "Defendant"), based on personal knowledge as to his own actions, and on information and belief as to all other matters, as follows:

<u>Nature of the Action</u>

        1.  This action arises out of Citi's malicious prosecution of Ramchandani.  As set forth herein, Citi made knowing and material misstatements to the United States Department of Justice (the "DOJ"), which relied upon those misstatements in obtaining the indictment of Ramchandani for felony violations of the United States antitrust laws without probable cause.

        2.  For over 11 years, Ramchandani was one of the most successful traders in the foreign currency exchange (or "FX") spot markets (the "FX Spot markets"), and

beginning in 2002, was employed as a trader for Citi, which he served loyally, and successfully, primarily as a trader in the Euro/Dollar ("EUR/USD") FX Spot market.

3.   In January 2014, however, Citi fired Ramchandani without cause in the midst of an investigation by regulators and law enforcement authorities into various elements of the FX Spot markets for currencies throughout the world.

4.   Immediately upon firing Ramchandani, Citi and began to leak false, and gravely derogatory, assertions against him, including to government investigators and the press.

5.   Ultimately, Citi quite literally fabricated an antitrust case for the United States Department of Justice (the "DOJ") against Ramchandani based upon knowingly false allegations that he engaged in market "manipulation" and "collusion."

6.   As the DOJ later acknowledged in a court filing, the government relied upon Citi both to identify Ramchandani as a putative wrongdoer, and to "decode" the highly technical communications that formed the putative ground for the case the DOJ brought against him.

7.   Citi well knew that the case it had formulated against Ramchandani was meritless.  Indeed, a Citi lawyer with full knowledge of the relevant facts and law volunteered that he recognized Ramchandani had not actually engaged in <u>any</u> intentionally wrongful conduct, let alone violated any law or regulation.

8.   Likewise, Ramchandani's manager at Citi, himself an experienced FX Spot market trader, who was responsible for reviewing, "decoding," and evaluating Ramchandani's purportedly culpable communications on behalf of Citi, volunteered that

Ramchandani had not engaged in any form of "collusion or price fixing", and likewise recognized "that there was nothing criminal in [Ramchandani's] intent or actions."

9.   In May 2015, Citi pled guilty to a federal antitrust charge expressly based upon the false allegations Citi itself had made against Ramchandani.

10. While Citi knew that the case it had constructed against Ramchandani was without basis in law or fact, Citi had a strong motive to frame Ramchandani nonetheless: self-interest.

11. By strictly limiting the basis for Citi's guilty plea to the activities of a single trader who participated in only one portion of the FX Spot markets, Citi and its senior management benefited in several, critical, ways.

12. First, Citi and its affiliates succeeded in drastically limiting the regulatory consequences of Citi's guilty plea.  Among other things, Citi successfully argued to the United States Securities and Exchange Commission (the "SEC") that, because of the purported fact that its wrongdoing was limited to a single individual, Citi should not be limited in its ability to participate in the United States securities and capital markets.

13. Second, by succeeding cabining its plea to purported wrongdoing by a single trader in a single portion of the FX Spot markets, Citi also succeeded in limiting the potentially catastrophic implications of a guilty plea for the myriad FX-related civil lawsuits it faced, and was likely to face, involving markets for other currencies.

14. Indeed, at the time that it engineered a guilty plea based solely upon Ramchandani's purported misconduct, Citi was aware that at least one of its former traders had engaged in serious misconduct in connection with trades in emerging market currencies

that were (unlike the EUR/USD FX Spot market) actually highly vulnerable to manipulation. That trader eventually pled guilty to federal crimes.

15. Finally, by successfully grounding its plea solely upon Ramchandani's nonexistent crimes, Citi limited scrutiny of, and potential charges against, its own senior managers and officers.

16. But as Citi well knew, successfully grounding its plea on a manufactured claim that Ramchandani had engaged in wrongdoing virtually ensured that Ramchandani would pay a heavy price:  Citi's scheme rendered Ramchandani's indictment not only possible, but inevitable.

17. Governing DOJ policy all but required prosecutors to charge purportedly culpable individuals when their corporate employers faced criminal liability.

18. Therefore, it is unsurprising that, on the day that Citi's plea was announced, a member of Citi's defense team characterized Ramchandani as the "collateral damage" from Citi's strategy.

19. And, on the day that the judge announced Citi's sentence and that of several other financial institutions, he openly called for the indictment of the putatively responsible individuals, necessarily including Ramchandani.

20. As expected, on January 10, 2017, Ramchandani was charged with federal antitrust crimes.

21. In announcing Ramchandani's indictment, the DOJ stated that it was seeking to "hold accountable the individuals who conspired on their behalf" of Citi and other banks that pled guilty.

22. But the DOJ was utterly unable to prove the case Citi had constructed for it before the jury.

23. The DOJ could not substantiate the allegations that Ramchandani had participated in a market "manipulation" and "collusion" scheme, drawn from Citi's purported "decoding" of the chats.

24. To the contrary, witnesses with experience in the industry testified that that chat room communications were actually normal course, and entirely proper, market communications.

25. Ramchandani, along with his fellow defendants, was acquitted of the entirety of the meritless charges.

26. As a result of Citi's grave and serious misconduct, however, Ramchandani has suffered extraordinary damages, including the effective destruction of his previously successful, and highly remunerative, professional career.

27. Ramchandani will never be able to fully rebuild the professional reputation, and the employment and compensation opportunities he lost as a result of Citi's knowing and malicious misconduct are in the tens of millions of dollars.

28. Ramchandani brings this action to recover for Citi's tortious conduct.

<u>Parties</u>

29. Ramchandani is an individual who is a citizen of the United Kingdom and resides in London.  From July 2002 until January 10, 2014, he was employed by Citibank, National Association.

30. On information and belief, Citigroup Inc. is a financial services holding company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

31. On information and belief, Citicorp is a financial services holding company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

32. On information and belief, Citibank, National Association is a federally chartered national banking association incorporated in South Dakota, and maintains an office in New York, New York and a branch in London, United Kingdom.

<u>Jurisdiction and Venue</u>

33. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because (i) Plaintiff is a citizen of a foreign state; and Defendants are each citizens of States; and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

34. Venue is proper in this District, including pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claim occurred in this District.

<u>Background</u>

35. <u>Ramchandani's employment by Citi</u>.  Ramchandani was first employed by Citi in 2002.  His employment offer letter, dated April 30 (and stamped May 4), 2004 (the "Employment Agreement") stated that he would be working in the "Citigroup Corporate and Investment Banking Unit," while his employment agreement identified Citibank, N.A. as his employer.

36. Beginning in April 2004, Ramchandani worked in Citi's London offices, where he served on Citi's FX Spot market trading desk; and, during the time period relevant to this Action, Ramchandani was European head of Citi's FX Spot market trading desk.

37. The FX Spot market.  Ramchandani's desk placed trades on behalf of Citicorp and its customers in the FX Spot market.

38. The FX Spot market is a global over-the-counter market in which participants buy and sell currencies.

39. In the FX Spot market, currencies are traded against one another in pairs.

40.  During the time period relevant herein, Ramchandani was primarily responsible for trades in euros and U.S. dollars (referred to herein as "EUR/USD" transactions.

41. As stated by the DOJ in the Plea Agreement (as defined further below), the EUR/USD currency pair is the most widely traded by volume, with a worldwide volume that can exceed $500 billion per day.

42. Ramchandani's supervisor.  Ramchandani traded under the direct supervision of Jeff Feig ("Feig"), who was, during the time period relevant to this Action, Citi's Global Head of Foreign Exchange.

43. Feig was a highly experienced FX trader, who had broad experience, including in the EUR/USD FX Spot market.

44. The "chatroom."   During the time period relevant to this Action, it was extremely common for FX Spot market traders to participate in informal electronic "chatrooms," often hosted on the Bloomberg platform.

45. The purpose of these on-line discussions is typically to facilitate trades in the FX Spot markets, which operate entirely over the counter and lack a formal exchange structure.

46. In this regard, FX Spot market chatrooms often functioned in much the same manner as private "dark pool" markets for equity securities, allowing buyers and sellers facilitate transactions amongst one another, thereby mutually serving the interests of their clients and employers.

47. In addition, such chatrooms often provided opportunities for traders to share market color and observations.

48. Beginning during or around December 2007, Ramchandani joined an informal chatroom group that was comprised of traders employed at other large financial institutions who also participated in the EUR/USD FX Spot market.

49. Although, as explained below, both the DOJ and Citi later averred that the purpose of the chatroom communications was to illegally "coordinate" trading among the participants, this was entirely untrue.

50. Rather, the purpose and function of the chatroom Ramchandani participated in was the same as that of most such informal chat room groups, i.e., to facilitate trades and share market color.

51. While the conduct of the participants in the chatroom was wholly benign, the participants used often colorful language, much of which employed an idiosyncratic nomenclature only fully understandable to other traders.

52. Accordingly, it more than possible that the meaning and intent of some of the communications could be misunderstood, absent the assistance of an informed and experienced market participant.

53. <u>The investigation commences</u>.  During or around June 2013, press reports began appearing regarding alleged "manipulation" of "benchmark" foreign exchange rates (or "fixes"), and other supposed misconduct, in the FX Spot markets.

54. Later reports indicated that regulators and law enforcement agencies, including DOJ and the United Kingdom's Financial Conduct Authority ("FCA"), had commenced  investigations, including of the EUR/USD FX Spot market.

55. On or around October 15, 2013, representatives of Citi, including Paul Ferguson ("Ferguson"), a Citi Managing Director and Senior Litigation Counsel, together with attorneys from Citi's outside counsel, Cleary Gottlieb Steen & Hamilton LLP ("CGSH"), jointly interviewed Ramchandani.

56. A CGSH attorney informed Ramchandani, who at that time was not represented by counsel, that CGSH represented only Citi, and not Ramchandani individually. A CGSH attorney also emphasized that CGSH was taking notes of the interview, and Ramchandani replied that he welcomed CGSH doing so.

57. Ferguson informed Ramchandani that Citi could choose to share anything he said during the interview with regulatory authorities and could also employ Ramchandani's statements in connection with internal Citi disciplinary proceedings.

58. After receiving these warnings, Ramchandani forthrightly and completely answered each of the Citi representatives' questions regarding his trading activities, and

demonstrated that the allegations and theories of misconduct that had been reflected in press reports were meritless.

59. Ramchandani also noted that, during the time period at issue, there had been no Citi policies barring participation in chat rooms, which (as explained) were pervasive in the FX Spot markets.

60. At the close of the interview, Ferguson asked Ramchandani to contact him in the event he remembered anything else that might be relevant to the matters at issue in the FX Spot market inquiries.

61. Citi's lawyers also stated that they would contact Ramchandani if they had additional questions or required additional information.

62. <u>Ramchandani offers to provide further information to Citi's counsel, but Citi declines the offer</u>.  During the ensuing days, additional press reports appeared suggesting that investigators were focused upon the chat room activities.  Those reports also made uninformed, and entirely erroneous, suggestions that the chatroom activities were wrongful, and potentially illegal.

63. Citi did not contact Ramchandani to ask further questions regarding these matters.

64. Ramchandani, however, recalled Ferguson's request that he share  any additional potentially helpful information he might have; further, Ramchandani recognized that he could assist Citi's counsel in understanding actual meaning of the often jargon-laced nature of the chatroom communications.

65. Accordingly, during or around, the week of October 21, 2013, Ramchandani contacted Ferguson to offer to review and explain the chatroom communications with him in detail.

66. Ramchandani made the offer recognizing that Citi would be able to use any additional information he volunteered as it might choose, including by sharing it with government investigators.

67. Ferguson, however, declined Ramchandani's offer, stating that Citi had determined that it was not in the Company's interest to engage in further direct substantive communications with him regarding the chatroom activities.  Ferguson explained that the FCA had demanded that it receive a recording of any such discussions, and Citi did not wish go forward with an interview on such terms.

68. Citi suspends Ramchandani, solely because of his participation in the chatroom.  On or around October 30, 2013, Feig and a representative of Citi's Human Resources Department ("HR" or "HR Department") told Ramchandani he was being directed to "take three weeks out of the office whilst matters relating to the FX trading issues are being investigated," with full pay and benefits.  That leave period was subsequently extended for months on end.

69. During the conversation, Feig stated, and the HR representative reiterated in a letter of the same date, that "no decision about wrongdoing has been made" and that the demand that Ramchandani agree to take a leave of absence was not an indication that Ramchandani had engaged in any violation of Citi guidelines, let alone the law.

70. Rather, the Citi representatives stated that "[w]e are taking this step to allow time for the internal investigation to develop and to protect you and Citi from media intrusion."

71. The HR representative also stated that "[w]e are likely to inform the FCA what we have agreed pursuant to our obligations of openness."

72. Citi requires Ramchandani to remain silent about his trading activities.  In connection with Ramchandani's leave, Citi expressly reserved the right to communicate with regulators and law enforcement authorities regarding Ramchandani.

73. In the October 30 letter, Citi, however, stated that Ramchandani was required to "keep matters relating to [Citi] and this FX issue confidential," and specifically instructed Ramchandani that "any press inquiries should immediately be directed to Jeff French" ("French"), a senior employee in Citi's Public Affairs Department.

74. In addition, in a letter agreement, dated November 21, 2013, respecting the reimbursement of certain legal expenses, Citi likewise required Ramchandani to agree not to "make any press statement or other public announcement . . . relating to the FX Issues or any related matters, without obtaining [Citi's] prior written approval unless required by law."

75.  Citi is ordered to investigate, and thereafter to report to the FCA, regarding any evidence of  FX Spot market trading market manipulation or coordination by Ramchandani, and responds by reporting it had found no such wrongdoing.  On or around November 8, 2013, the FCA sent Citi a letter mandating that, by January 31, 2013, Citi provide all documents concerning, among other things, potential manipulation of benchmark foreign exchange rates and/or other collusive or fraudulent conduct in relation to FX trading.

76. On or around November 26, 2013, Citi's counsel wrote to the FCA to state that Citi had expedited that portion of its response to the FCA's queries related to Ramchandani.

77. In that regard, Citi reported that it had provided the FCA with copies of all, or virtually all, of the Bloomberg chats in which Ramchandani had participated.

78. Citi later went on to inform the FCA that, long after producing (and presumably reviewing) all such materials, Citi had not made any "specific finding" that Ramchandani engaged in misconduct relating to FX Spot market trading.

79. The press reports that Citi is in the crosshairs of a criminal antitrust investigation respecting the FX Spot markets.  By the fall of 2013, press reports began to indicate that the participation of large banks, including Citi, in the FX Spot markets was an increasing focus of regulatory inquiries.

80. For example, a November 14, 2013 New York Times article stated that the DOJ was investigating "a group of traders [that] shared a mission to alter the price of foreign currencies, the largest and yet least regulated market in the financial world."

81. The article went on the state that, "[a]lthough the investigation is at an early stage, authorities are already signaling the likelihood of a legal crackdown", reportedly involving the Criminal and Antitrust Divisions of the DOJ.

82. The article quoted then Attorney General Eric Holder stating that the "manipulation we've seen so far may just be the tip of the iceberg," and that "[w]e've recognized that this is potentially an extremely consequential investigation."

83. Thus, by early 2014, Citi well knew that the DOJ might ultimately seek to bring criminal charges against one or more Citi entities; Citi therefore needed to begin considering just what sort of charges it might ultimately be willing to plead to.

84. As we will explain below, and for a for a number of reasons, Citi had a strong motive to seek to pin any charges it might ultimately be held responsible for upon Ramchandani, and Ramchandani alone, despite the avowed recognition of responsible and informed members of Citi's management and legal staff that he was innocent of any intentional, let alone criminal, wrongdoing.

85. Accordingly, Citi began a campaign to identify Ramchandani to both government investigators and the press as a uniquely culpable wrongdoer.

86. <u>Citi fires Ramchandani, but refuses to explain why</u>.  Citi's campaign started with the firing of Ramchandani, together with a coordinated finger pointing effort against him.

87. On or around January 10, 2014, Feig and a representative of Citi's HR Department telephoned Ramchandani while he was traveling in India.

88. Feig, who led the call, emphasized that he had been "part of [Citi's internal] review" of Ramchandani's conduct, and that he was "manager involved" in reviewing, <u>i.e.</u>, "decoding," the chatroom communications.

89. This was unsurprising, given that, as an experienced trader in the FX Spot markets (including the EUR/USD market), Feig was in a uniquely strong position to understand the meaning and significance of the chat room communications.

90. Feig stated that he believed that Ramchandani was a "good person," but then asserted that certain, unspecified portions of his chatroom communications constituted grounds for termination.

91. Ramchandani asked Feig to identify the particular chats at issue and explain why they purportedly constituted grounds for termination.

92. Feig, however, declined Ramchandani's request, and stated only that "when you read them[i.e., the chats] you will understand."

93. Ramchandani replied that he had in fact had the opportunity to review several of the chat records, and remained in the dark about which statements might be problematic; Ramchandani therefore reiterated his request that Feig identify the specific statements at issue.

94. Feig again declined to identify the chatroom communications at issue or to specify and explain why Citi deemed them to be problematic.

95. In a letter also dated January 10, 2014, the HR Department representative stated that Citi had not reached "any conclusions regarding the matters being investigated," but asserted that "a number of your communications have been found to be wholly unacceptable."

96. Like Feig, the HR representative's letter failed to identify the communications at issue, let alone to state why they purportedly were "unacceptable."

97. But while Feig and the HR representative stated that unspecified communications constituted grounds for termination, they neither stated nor suggested that Ramchandani had violated any regulation or law, let alone that he had engaged in price fixing or any other antitrust violation.

15

98. Furthermore, as discussed below, Feig volunteered to Ramchandani several years later, that, during his review of the chat records on behalf of Citi, Feig had never seen any evidence that Ramchandani had engaged in any form of "collusion or price fixing", and had likewise always recognized "that there was nothing criminal in [Ramchandani's] intent or actions."

99. Rather, Feig's <u>sole</u> concerns related to the tone and language Ramchandani had used in certain chat messages.

100.     During the January 10 telephone conversation, Feig informed Ramchandani, and the HR representative's letter restated, that Citibank would pay Ramchandani three months' salary as a severance payment, in accordance with the terms of his Citi Employment Agreement.

101.     Under those contractual terms, severance is <u>not</u> payable if an employee is dismissed for, among other things, "gross misconduct" or "gross negligence." Accordingly, Citi would not have had any obligation to pay the severance amount had Citi believed that Ramchandani engaged in any form of intentional misconduct, let alone criminal conduct.

102.     At the close of the phone call with Ramchandani, Feig reminded Ramchandani of Citi's direction that he not communicate with the press or other third parties regarding the FX matters.

103.     Feig, however, emphasized, that Citi "respected" Ramchandani's "privacy" and stated that Citi would only inform the FCA he was "no longer employed" by Citi, and would likewise not provide any information regarding the circumstances of his departure to other parties, presumably including the press.

104.     In the January 10 letter, the Citi HR representative reiterated that Citi would solely inform the FCA of the "termination" of his employment.

105.     <u>Citibank's embarks on a secret scheme to dirty up Ramchandani, and suggest that he is a wrongdoer.</u>  While Citi had lulled Ramchandani into remaining silent by promising to respect his "privacy," internal Citi records establish that Citi actually implemented a calculated scheme to dirty up Ramchandani by contacting regulators and the press to suggest that Ramchandani had engaged in serious, and potentially criminal, misconduct.

106.     <u>First</u>, in correspondence commencing on the morning of January 10, Citi Public Affairs executive French, who was apparently under the weather, sent an email to his colleagues relating that he had chosen not to call in sick because he wanted to be in the office to implement what he later called a "no fingerprints concept" to publicize Ramchandani's departure.

107.     After a colleague relayed advice purportedly provided by an in-house Citi lawyer in New York, French expressed satisfaction that he was now free to expand upon the initial plan by telling reporters Citi had taken a "proactive step," <u>i.e.</u>, firing a supposed wrongdoer.

108.     Thus, French's "concept" entailed breaching Feig's promise to respect Ramchandani's privacy, and communicating with multiple reporters to plant stories about Ramchandani's purported culpability.

109.     French stated that he planned to contact reporters at Bloomberg, the Wall Street Journal and the Financial Times, and – based on the resulting press coverage

– it appears likely that French or his Citi colleagues contacted other members of the press as well.

110.     The resulting news reports uniformly described Ramchandani as being a participant in potentially serious misconduct.

111.     In a story by the Bloomberg reporter French contacted, French was quoted as stating that Ramchandani has been placed on leave for three months, more than suggesting, expressly contrary to Citi's prior representations to Ramchandani, that the leave had been the result of a finding of potential wrongdoing.

112.     The article went on the assert that Ramchandani was at the center of multiple government investigations stating:  "Regulators are probing whether traders at the world's largest banks colluded through instant-message groups to manipulate benchmarks . . . . "; and also stated that "Ramchandani was part of a message-group other traders referred to as the 'Cartel' that is under investigation."

113.     In subsequent correspondence, French expressed alarm that the Bloomberg reporter had identified him as a source for the story, and recounted that he had immediately contacted the reporter in an, ultimately unsuccessful, effort to have his name removed from the story.

114.     French and his Citi colleagues were not named as sources for the multiple other stories, also published on or around January 10, regarding Citi's firing of Ramchandani; but each of the stories contained similar assertions Ramchandani was at the center of a potentially criminal market manipulation scheme.

115.     Second, Citi also communicated its message that Ramchandani had engaged in misconduct directly to law enforcement authorities.

116.    As reflected in an internal FCA email dated January 10, 2014, on or around that date, a representative of Citi contacted the FCA to state that Citi intended to fire Ramchandani.

117.    But instead of limiting its notice to a statement that Ramchandani had left Citi's employ as expressly promised, the Citi representative reportedly went on the state that -- after a "review of communications," and despite the absence of a "specific finding" of wrongdoing -- Citi's management did "not feel comfortable" with Ramchandani's conduct, thus unmistakably labeling Ramchandani as a wrongdoer.

118.    Given that a DOJ inquiry was then ongoing, it highly likely that Citi or its outside counsel had similar communications with the DOJ.

119.    Finally, Citi took steps transparently calculated to encourage negative "leaks" about Ramchandani to the press from within Citi's own ranks, so as to supplement the leaks being orchestrated by French and his colleagues.

120.    Also on January 10, 2014, Citi distributed an internal memorandum to various managers stating that "[w]e expect various media to report that Citi has terminated" Ramchandani.

121.    The memorandum did not state why Citi had that expectation; but the document made clear the message Citi wanted to be sent by any Citi personnel who might be contacted about the matter.

122.    Thus, the memorandum stated that Ramchandani had been "placed on leave amid investigations by various international regulators into allegations of market manipulation," again suggesting – contrary to fact – that Ramchandani had faced allegations of wrongdoing at the time he was placed on leave,

123.   The memorandum went on to suggest that Ramchandani was directly in the crosshairs of potential charges, stating that "[m]edia has previously reported that regulators are focusing on a particular instant-messaging group that was populated by Rohan and traders at other banks."

124.   Thus, while the memo purported to instruct recipients to contact French or a colleague in the Citi's Public Affairs Department, it also expressly prepared the recipients to echo Citi's "no fingerprints" campaign themselves by likewise pointing a finger of accusation directly at Ramchandani.

125.   Also on January 10, after the press reports that were the fruit of Citi's campaign to dirty up Ramchandani began to appear, internal Citi correspondence indicates that French was contacted by Feig.  According to French, Feig was irate, apparently because Citi had, in a deliberate and calculated manner, breached the express promise to maintain Ramchandani's "privacy" that Feig made to Ramchandani.

126.   Citi's campaign to sully Ramchandani contrasts starkly with Citi's treatment of other Citi personnel.

127.   In other instances in which an employee was terminated in connection with the FX Spot market inquiries, Citi assiduously avoided any publicity for such job actions.

128.   Indeed, even in the case of the FX Spot market trader who ultimately pled guilty to felonies, Citi managed to avoid any press attention to his departure until the plea was publicly announced.

129.   <u>Citi's own lawyer expressly recognizes that the intimations of misconduct against Ramchandani are wrong, and recommends Ramchandani for employment</u>

<u>in a position of trust and confidence</u>.  Even as Citi was deliberately preparing the way to make Ramchandani into a fall guy, Ferguson, the internal Citi lawyer with the most detailed knowledge of the factual and legal issues related to the FX Spot market inquiries, repeatedly stated that Citi had no basis to accuse Ramchandani of intentionally wrongful (let alone illegal) conduct.

130.     During a meeting on or around February 17, 2014, Ferguson volunteered to Ramchandani that, after further reviewing the chatroom records and other relevant evidence, he was certain that Ramchandani had not engaged in any intentional, let alone criminal, conduct.

131.     Ferguson also stated that, while Citi reserved the right to argue that some of Ramchandani's chatroom language might have violated unspecified Citi policies, he knew that even such putative policy breaches "would not ever have been intentional by you." Ferguson went on to say:   "I would love to see this whole thing blow over and see you back at the bank by the end of the year."

132.     During the ensuing months, however, Ramchandani's name repeatedly appeared in press reports, again suggesting that Ramchandani had engaged in potentially illegal conduct.  Therefore, during or around October 2014, Ramchandani asked for the opportunity to meet again with Ferguson.

133.     Ferguson agreed, and, on or around October 10, 2014, Ferguson met with Ramchandani in person.

134.     During the October 10 meeting, Ferguson once again volunteered that Citi continued to recognize that Ramchandani had not engaged in market manipulation or like antitrust violations, or indeed any violation of law.

135.     Ferguson also volunteered that Citi "will never make an admission of market manipulation to the regulators because there is no evidence of that. That is why we even wrote you a letter stating that.   Moreover I have even suggested/stated to the Board [of Directors] that if we were to admit to the regulators we manipulated the [FX Spot market] without there being any evidence, our employees would sue us".

136.     Ferguson went on to reiterate his confidence in Ramchandani's probity by stating:  "off the record I would be happy to give you a reference.  If I were, say, Standard Chartered Bank, I would hire you tomorrow as you are good and honest.  I do honestly believe you never did anything intentional against the bank."

137.     In fact, Ferguson later vouched for Ramchandani, as he had represented he would.

138.     On October 30, 2014, Ferguson called Ramchandani to say that he was recommending that a friend consider hiring Ramchandani to work at a new FX Spot market trading business.

139.     Ferguson thereafter followed up his call with an email introducing Ramchandani to the potential employer.

140.     It is nonsensical to suggest that Ferguson, who by then had long been familiar with the entirety of the relevant record, believed that Ramchandani was

involved in any antitrust price fixing scheme, let alone a potentially criminal one, even as he reached out to recommend Ramchandani for employment in a position of trust by another financial institution.

141.     <u>Faced with the increasing risk of a criminal charge, Citi has a clear motive to ensure that the scope of the charge it faces is as narrowly limited as possible.</u>  As press reports indicated, in the wake of Ramchandani's termination, it became increasingly likely that Citi, along with other banks, would face criminal charges.

142.     For example, on February 7, 2014, Reuters reported that UBS Group AG ("UBS") was seeking to take advantage of a program of the DOJ's Antitrust Division that allows purported participants in criminal antitrust schemes potentially to obtain immunity from criminal charges in return for providing information of alleged misconduct to the DOJ.

143.     Furthermore, Citi itself was facing the possibility of a wide-ranging probe that could well impact other FX Spot market trading desks, including desks trading emerging market and other far more lightly traded currencies.

144.     The markets for many such less widely traded currencies were far more liable to actual manipulation and coordination than the massive EUR/USD FX Spot market.  In fact, as discussed above, during 2014, another Citi trader resigned after Citi discovered misconduct related to his trades in one or more emerging market currencies, and that same trader ultimately, during 2017, pled guilty to felonies.

145.     Also, Lorretta Lynch, who succeeded Eric Holder as Attorney General, later publicly indicated that she considered broad swaths of the FX Spot markets to be infected with fraud (and indeed did so during a press conference concerning Citi's later plea deal), a position that the lead prosecutor would reiterate to the jury during Ramchandani's own trial.

146.     These circumstances created a business problem for Citi.

147.     Citi simply could not afford to go to trial on a criminal charge.  It is effectively impossible for banks and capital markets participants like Citi to operate under the cloud of criminal charges, including because of the risk of immediate loss of access to capital markets, as well as the loss of requisite licenses and regulatory approvals.

148.     Therefore, if Citi was to be faced with criminal charges, it would effectively have no choice but to plead guilty.

149.     Yet, if Citi pled guilty to charges that implicated large portions of the worldwide FX Spot markets, the resulting civil liabilities could be immense.

150.     Furthermore, if Citi pled to a wide-ranging crime scheme implicating multiple senior personnel, the argument for obtaining waivers from regulatory consequences, and thereby retaining the requisite licenses from the SEC and other agencies, would be far, far weaker.

151.     Also, a corporate plea based on broad swaths of Citi's FX Spot market trading activities would likely increase the chances that senior managers, or officers, of Citi would likewise ultimately face criminal charges.

152.     Therefore, if Citi was to plead guilty, it had every interest in pleading guilty to charges that portrayed the putative wrongdoing as limited in scope and involving a limited number of employees, or – if possible – one employee.

153.     As it turned out, given the stakes involved, Citi ultimately proved willing not only to plead guilty to, but indeed to construct, a crime that had never occurred, grounded solely on the purported wrongdoing of one person:  Ramchandani.

154.     <u>Citi pleads guilty, and declares Ramchandani to be "collateral damage."</u>   On or around May 20, 2015, the DOJ and Citicorp entered into a plea agreement (the "Plea Agreement") that was filed in the United States District Court for the District of Connecticut.

155.     Pursuant to that agreement, Citicorp agreed to plead guilty to a criminal violation of Section 1 of the Sherman Act, 15 U.S.C.  § 1.

156.     As specified in the Plea Agreement, the sole and entire basis for the charge was Citi's purported participation, "through one of its EUR/USD traders . . . in a conspiracy" to "fix, stabilize, maintain, increase or decrease the price of, and rig bids and offers for, the EUR/USD currency pair exchanged in the spot market."

157.     As explained, it was Ramchandani who was responsible for Citi's EUR/USD trading.

158.     Accordingly, the entirety of the charge Citi pled to was based upon supposed misconduct by  Ramchandani, and Ramchandani, alone.

159.     But while the DOJ charged Citi with a narrowly defined offense based solely on Ramchandani's putative misconduct, in return for Citi's compliance with the terms of the agreement, the DOJ expressly agreed not to charge Citi or other related

25

companies with, among other things, a broad range of offenses throughout the worldwide FX

Spot markets, including:

> any combination and conspiracy occurring before the date of signature of this Plea Agreement to fix, stabilize, maintain, increase or decrease the price of, and rig bids and offers for, the EUR/USD currency pair, or any other currency pair exchanged in the FX Spot market, or any foreign exchange forward, foreign exchange option or other foreign exchange derivative, or other financial product (to the extent such financial product was disclosed to the United States)[.]

160.     Materials subsequently submitted by both the DOJ and Citi

confirmed that, in advance of the plea agreement, Citi had not merely fingered Ramchandani

as a putative wrongdoer, but that Citi had quite literally manufactured the supposed case

against Ramchandani that formed the basis for the Company's plea.

161.     The DOJ made this plain in a sentencing memorandum, dated

December 1, 2016 (the "DOJ Memorandum" or "DOJ Memo").

162.     First, the DOJ Memo expressly stated that the government relied

on Citi to identify Ramchandani as a potential wrongdoer.

163.     In the memorandum, the DOJ stated that, while the government

generally relies upon the cooperation of "insiders" in antitrust conspiracy investigations, this

was "especially true" in the Citi FX Spot markets cases.

164.     Thus, the DOJ stated that, because the FX Spot markets include

numerous currencies and a plethora of associated chatrooms employed by numerous traders,

the DOJ relied upon Citi to aid in identifying, and thus allowing the DOJ to "devote its

resources to investigating[,] only the most appropriate chatrooms and currencies."

165.     On the own DOJ's account, based upon Citi's "help," the DOJ limited its investigation of Citi to all of about 12 chatrooms that Citi itself "brought to the United States' attention," presumably including the chatroom Ramchandani participated in.

166.     Second, the DOJ Memo also made it plain that the government likewise relied on Citi to explain the coded meanings of the chatroom communications on which the DOJ grounded its case.

167.     Thus, the DOJ acknowledged that the communications in the chatroom were often filled with dense jargon, describing highly technical trading strategies that were frequently conveyed in shorthand.  DOJ investigators were, on their own account, therefore simply unable to understand the meaning of many of the chatroom communications themselves.

168.     Instead, according to the DOJ, the government relied upon the "valuable assistance" of Citi personnel, not only to explain how the FX Spot markets operate, but also to "defin[e]" and "decod[e]" the purportedly culpable chats themselves.

169.     Indeed, per the DOJ, the government sometimes relied upon Citi to provide "line-by-line" accounts of the purported meaning of chatroom communications.

170.     Thus, on the DOJ's own account, the government heavily relied upon Citi itself in narrowing the scope of the government's investigation to what, at the end of the day, amounted to a single chatroom: Ramchandani's; and the government likewise relied upon Citi to "decode" Ramchandani's chatroom statements, and to relate and explain to the DOJ the purportedly culpable meaning and intent of Ramchandani's statements.

171.     Put otherwise, the DOJ avowedly relied upon Citi to identify, and build a case focused exclusively upon, Ramchandani.

27

172.     For its part, Citi, in its submissions to both the sentencing court and regulators, emphasized the narrow scope of the case that the DOJ had constructed with Citi's close guidance.

173.     In Citi's December 1, 2016 sentencing memorandum to the District Court (the "Citi Memorandum" or "Citi Memo"), Citi asserted that the sole purported wrongdoer was "one Citi employee . . . based in London", i.e., Ramchandani.

174.     Citi went on to assert that Ramchandani acted in contravention of Citi policies (without stating what those policies were).

175.     Citi also asserted that Citi had terminated Ramchandani because of the purported "wrongdoing" alleged by the DOJ, i.e., his participation in an antitrust conspiracy.

176.     Also, in a May 20, 2015 letter to the SEC (the "SEC Submission"), in which Citi sought to avoid sanctions that could drastically limit its participation in certain securities and capital markets activities, Citi similarly asserted that its criminal liability arose from "isolated acts by one employee", i.e., Ramchandani, and likewise falsely asserted that Citi had "terminated" Ramchandani on account of his participation in knowingly criminal conduct.

177.     In fact, as explained, Citi representatives did not make any allegations of illegal activity in connection with Ramchandani's termination.

178.     Furthermore, Citi's in-house counsel, Ferguson, and his manager, Feig, both recognized that Ramchandani had not engaged in any intentional wrongdoing, let alone participated in a criminal conspiracy.

179.     By causing the false allegations against Ramchandani to be the centerpiece of the case against Citi, Citi renders Ramchandani's indictment a virtual certainty.  As reflected in a memorandum promulgated by the Deputy Attorney General in 2015, the DOJ had a formal policy of seeking to prosecute individual employees who were putatively responsible for conduct giving rise to the criminal prosecutions of corporations.

180.     Therefore, as Citi well knew, when Citi chose to fashion a theory of criminal liability for the DOJ based upon the purportedly solitary wrongdoing of Ramchandani, Citi rendered it all but inevitable that Ramchandani would also face criminal antitrust charges.

181.      Citi's counsel openly acknowledged this on the day Citi's plea agreement was announced, describing Ramchandani as "collateral damage", i.e., as an innocent victim of Citi's strategic choice to manufacture a case based upon his purported misconduct.

182.     The inevitability that Ramchandani would be charged become all the more clear during a January 5, 2017 sentencing hearing for Citi and other banks, wherein the sentencing judge openly questioned when the DOJ would commence cases against the allegedly culpable individuals, i.e., including Ramchandani.

183.     Ramchandani is indicted, but the case Citi assembled for the government collapses at trial.  On January 10, 2017, the DOJ announced the indictment, in the United States District Court for the Southern District of New York, of Ramchandani and two other chatroom participants.

184.     In an accompanying DOJ press release, the chatroom was described as the "Cartel" and its participants as the "Mafia."

29

185.     Deputy Attorney General Yates, the author of the memorandum discussed above, stated that "[t]oday's indictment reiterates our commitment to holding individuals accountable for corporate misconduct."

186.     When, however, the DOJ attempted to prove the case Citi had constructed for it before a jury, the government failed utterly, because the evidence failed to support the allegations.

187.     Relying upon Citi's supposed "decoding" of the allegedly culpable chatroom statements, the DOJ attempted to demonstrate that Ramchandani and other chatroom participants had participated in a culpable conspiracy.

188.     In fact, however, as an experienced FX Spot market participant testified, the communications that Citi had purportedly "decoded" to reveal "coordination" and other forms of illegal conduct were actually entirely normal course communications relating to placing trades and sharing market color,

189.     Feig recognizes that there was no basis for the criminal charges against Ramchandani.  On October 26, 2018, after the trial had concluded, but before verdict was announced, Feig, the manager and experienced FX Spot market trader who had personally reviewed the Bloomberg chats on behalf of Citi, sent an unsolicited email to Ramchandani.

190.     Feig made it plain that, like Ferguson, he had never seen any basis in fact to charge Ramchandani with price fixing, stating that he  "believed before the trial that there was no basis for any charges against you for collusion or price fixing."

191.     The trial only further convinced Feig of the meritless nature of the charges.  Feig said that he had read the trial transcripts, and, remarked that,"[h]aving seen the

government's case", "I am shocked and appalled you were indicted at all.  I just don't see the case.  The evidence is not there", as "anyone with a basic understanding" of the market would recognize.

192.     Feig concluded by reiterating that Ramchandani did "nothing illegal" and said he was "praying the Jury sees your innocence as clearly as I do."

193.     <u>Ramchandani is acquitted</u>. The jury did.  Later on that same day., the court announced that the jury had acquitted Ramchandani and his fellow chatroom participants of all charges.

194.     <u>Feig recognizes that Citi manufactured the meritless case against Ramchandani to serve its own interests</u>.  In the wake of the verdict of acquittal, Feig wrote Ramchandani again, this time to explain that Citi was responsible for fashioning the false criminal case against Ramchandani, and that Citi did so to serve its own interests and those of its senior management.

195.     As Feig explained, "Citi facilitated the criminal charges by testifying in writing to the government that you were the single and sole violator of Citi's rules and that you committed a criminal act which they pled guilty to.  This wasn't true at the time and certainly isn't with further evidence that has come through since the time of the plea."

196.     Put otherwise, Citi knowingly and deliberately constructed a case against Ramchandani without probable cause, and did so to serve Citi's own interests.

First Cause of Action<br>(Malicious Prosecution)

197.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 to 196 above as if fully set forth herein.

198.    As alleged herein :

- Defendants commenced a criminal proceeding against Ramchandani, including by making materially false representations to the DOJ;

- The proceeding terminated in Ramchandani's favor with his acquittal;

- Defendants lacked any probable cause for encouraging such proceedings, and indeed affirmatively knew Plaintiff to be innocent;

- Defendants acted with malice, including in order to avoid, or limit, the imposition of civil, criminal and/or regulatory liability upon Defendants for other misconduct; and

- Ramchandani suffered damages as a result of Defendants' malicious conduct.

WHEREFORE, Plaintiff prays that this Court:

(a)     Grant an award of damages to Plaintiff in an amount to be determined by the Court, but no less than $112 million;

(b)     grant exemplary damages to Plaintiff in an amount to be determined by this Court;

(c)     grant awards of pre- and post-judgment interest in favor of Plaintiff;

(d)     grant an award of Plaintiff's attorney's fees and all other applicable costs of this action; and

(e)     grant such other and further relief as this Court may deem to be just and proper.

<u>Jury Demand</u>

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: Brooklyn, New York
October 2, 2019

LAW OFFICE OF DAVID R. LURIE, PLLC


By: _____//s//_____
        David R. Lurie

194 President Street
Brooklyn, New York 11231
(347) 651-0194

*Counsel to Plaintiff Rohan Ramchandani*