```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/11/2021
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
ROHAN RAMCHANDANI,                      :
                                        :
                     Plaintiff,         :
                                        :   19 Civ. 9124 (VM)
        - against -                     :
                                        :   **DECISION AND ORDER**
CITIGROUP, INC., et al.,                :
                                        :
                     Defendants.        :
---------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Rohan Ramchandani ("Ramchandani" or "Plaintiff") brings this action against defendants CitiBank National Association, his former employer; CitiGroup Inc.; and Citicorp (collectively, "Citi" or "Defendants"). The Complaint alleges one count of malicious prosecution stemming from Citi's disclosure of information about Ramchandani to the United States Department of Justice ("DOJ") in connection with an investigation into a price-fixing conspiracy at Citi. (See "Complaint," Dkt. No. 17 ¶¶ 197-98.)

Now pending before the Court are the premotion letters exchanged between the parties, which the Court construes as a motion by Defendants to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)")

(the "Motion").[1] For the reasons set forth below, the Motion
is **DENIED** in its entirety.

## I.   BACKGROUND

A.   FACTS[2]

1.   Ramchandani's Trading Role and Conduct

Ramchandani began his employment at Citi in 2002. During
the period relevant to this action, between 2004 and 2013,
Ramchandani worked in Citi's London offices, as the European
head of Citi's foreign exchange spot market ("FX Spot Market")
trading desk. The FX Spot Market is a global over-the-counter
market in which participants trade currencies against one
another in pairs. Ramchandani was specifically responsible
for trades in euros and U.S. dollars, the most widely traded
currency pair. His supervisor, Jeff Feig ("Feig"), was a
highly experienced FX Spot Market trader with experience in
this market and others.

During the relevant period, Ramchandani's trading
involved frequent communication with traders at other
financial institutions in chatrooms, often hosted by

---

[1] Kapitalforeningen Lægernes Invest v. United Techs. Corp., 779 F. App'x
69, 70 (2d Cir. 2019) (Mem.) (affirming the district court ruling deeming
an exchange of letters as a motion to dismiss).
[2] Except as otherwise noted, the following background derives from the
Complaint. The Court takes all facts alleged therein as true and construes
the justifiable inferences arising therefrom in the light most favorable
to Plaintiff, as required under the standard set forth in Section II,
infra.

Bloomberg. He alleges that communicating in chatrooms as he did was "extremely common." (Complaint ¶ 44.) These online discussions facilitated trading in the FX Spot Market and provided traders an opportunity to share market color and observations with each other.

In December 2007, Ramchandani joined an informal chatroom comprising traders in the euro and U.S. dollar FX Spot Market at a number of other large financial institutions. While Ramchandani asserts that the conversations in the chatroom were all above board, he acknowledges that the language used was often "colorful," and employed an "idiosyncratic nomenclature" that only other traders would understand. (Id. ¶ 51.) The DOJ and Citi later pointed to these chatrooms as channels in which participants illegally coordinated trades. Ramchandani insists this characterization is entirely false.

### 2. Ramchandani's Suspension Amid Price-Fixing Rumors

Around June 2013, rumors began to spread in the press about widespread manipulation of foreign exchange rates in the FX Spot Market. The DOJ and the United Kingdom's Financial Conduct Authority ("FCA") both commenced investigations into the alleged manipulation.

Citi, for its part, began its own internal investigation. As a part of that investigation, on October 15, 2013, Ramchandani was interviewed by representatives of Citi, including in-house counsel Paul Ferguson ("Ferguson"), and outside counsel from Cleary Gottlieb Steen & Hamilton LLP. At the meeting, Ramchandani answered questions regarding his trading activities, including his chatroom communications.

A few weeks after his interview, Ramchandani was suspended from Citi. Citi representatives told Ramchandani that the purpose of his suspension was to allow the internal investigation to develop and to shield him from media attention. Feig told Ramchandani at the time that "no decision about wrongdoing has been made." (Complaint ¶ 69.) Consistent with this representation, the following month, Citi provided the FCA with copies of virtually all of the Bloomberg chats in which Ramchandani had participated and informed the FCA that it had not made any "specific finding" as to whether Ramchandani had engaged in misconduct. (Id. ¶¶ 76-78.)

Meanwhile, press reports began to make clear that criminal charges against financial institutions participating in the FX Spot Market were imminent. Ramchandani alleges that it was then, in early 2014, that Citi began a campaign to use

4

him as a scapegoat in both the press and with government investigators.

    3.    <u>Ramchandani's Termination and Citi's Alleged Plan to Blame Ramchandani</u>

In January 2014, Feig and a Citi representative called Ramchandani. Feig stated that while he considered Ramchandani a "good person," certain portions of his chatroom communications were grounds for termination. (Complaint ¶ 90.) Despite Ramchandani's repeated requests, Feig declined to identify and discuss any of the particular communications at issue. A letter from a Citi representative that same day also failed to identify the specifically problematic communications but stated that Citi had found a number of Ramchandani's communications to be "wholly unacceptable." (<u>Id.</u> ¶¶ 95-96.)

Ramchandani alleges that during this time, Citi began to contact regulators and the press as part of "a calculated scheme" to deflect the blame for any wrongdoing onto him. (<u>Id.</u> ¶ 105.) The possibility of wide-ranging criminal liability created a business problem for Citi. Ramchandani contends that Citi could not go to trial on any criminal charges because the trial would significantly interrupt its business, so Citi had no choice but to plead guilty. It was in Citi's interest, however, to plead guilty to only limited

charges, so as to avoid significant liability, the risk of regulatory consequences, the loss of licenses, and the filing of charges against numerous senior employees. Ramchandani argues that Citi therefore attempted to limit the scope of its liability to a single culpable employee: him.

4.   Citi's Leaking of False Information to the Press

Ramchandani contends that, as part of the alleged plan to scapegoat him, a Citi public affairs executive, Jeff French ("French"), began correspondence the day of Ramchandani's dismissal indicating that he wanted to publicize the dismissal. After receiving legal advice, French expressed that he was pleased to expand the initial plan to scapegoat Ramchandani by informing reporters of the "proactive step" Citi had taken in firing Ramchandani. (Complaint ¶ 107.) Ramchandani alleges that, despite Citi's representations that it would disclose only the fact of Ramchandani's departure, French planted stories about Ramchandani's purported wrongdoing with multiple reporters at Bloomberg, the Wall Street Journal, and the Financial Times.

In turn, various news reports identified Ramchandani as a possible participant in the alleged price-fixing conspiracy, and in one case, directly quoted French. Though additional news stories did not name French or other sources

at Citi, Ramchandani argues that Citi was also behind these stories because they contained similar assertions regarding his conduct.

Ramchandani alleges that Citi encouraged further leaks from within the bank by circulating a memorandum to various managers about his dismissal. The memorandum did not state why press inquiries were expected but indicated that previous stories had reported that regulators were focusing on a particular chatroom in which Ramchandani had participated. The memorandum directed its recipients to contact the public affairs department if they received any press inquiries, but Ramchandani alleges that the content of the memorandum all but ensured that Citi managers would perpetuate the scapegoating campaign Citi had already initiated against him.

   5.   Citi's Guilty Plea and Alleged False Statements to
        Law Enforcement

Ramchandani alleges that Citi repeatedly implicated him in communications with regulatory agencies investigating the purported conspiracy. For example, Ramchandani contends that Citi contacted the FCA on the date of his dismissal, stating Ramchandani was to be fired. Instead of limiting the message in the way it had assured Ramchandani it would, Citi told the FCA that it did "not feel comfortable" with Ramchandani's conduct after reviewing his chatroom communications.

(Complaint ¶ 117.) Given that the DOJ investigation was also ongoing at the time, Ramchandani argues that Citi likely made the same disclosure to the DOJ. Ramchandani further alleges that, despite the fact that Citi did not identify criminal conduct as cause for his dismissal in its explanation to Ramchandani, Citi later told the Securities and Exchange Commission ("SEC") that it had terminated Ramchandani for this reason.

Ramchandani insists that, to manage its potential exposure and limit the negative consequences that could result, Citi ultimately pled guilty to a completely fabricated crime, grounded on the purported wrongdoing of just Ramchandani. Indeed, the plea agreement Citi entered with the DOJ indicates that Citi participated in the price fixing scheme "through one of its . . . traders." (Id. ¶ 156.) Likewise, Citi's sentencing memorandum asserted that its sole purported wrongdoer was "one Citi employee . . . based in London." (Id. ¶ 173.)

As evidence of Citi's motive, Ramchandani points to a Citi letter to the SEC seeking to avoid sanctions in which Citi asserted that its criminal liability arose from "isolated acts by one employee." (Id. ¶ 176.) According to Ramchandani, Citi's plan worked, and in exchange for pleading

guilty, the DOJ expressly agreed not to charge Citi in a broader range of offenses.

Moreover, the sentencing memorandum the DOJ submitted in connection with Citi's guilty plea stated that, in this case, it relied on the cooperation of insiders more than in other antitrust conspiracy investigations given the complexity and volume of chatroom records. Thus, Citi assisted the DOJ in identifying "the most appropriate chatrooms and currencies" and decoding the relevant communications. (Complaint ¶¶ 164, 166.) Ramchandani concludes from these statements that the DOJ relied upon Citi to build a case focused exclusively upon his conduct.

6.   Ramchandani's Indictment

On January 10, 2017, the DOJ announced Ramchandani had been indicted along with two other chatroom participants from other financial institutions. Ramchandani insists that he was indicted because of Citi's false statements putting him at the center of the case. According to Ramchandani, Citi knew it was DOJ policy to prosecute individual employees responsible for conduct resulting in charges against corporations, and thus Citi knew that its false allegations would cause Ramchandani to be criminally charged. Ultimately, after trial in October 2018, Ramchandani was acquitted.

9

7.   <u>Evidence of Ramchandani's Innocence</u>

In support of his assertion that Citi's alleged claims about his participation in the price-fixing conspiracy were untrue, Ramchandani points to communications in which two Citi employees admitted to him they did not believe he had engaged in any intentional misconduct.

First, several years after Ramchandani's termination, Feig, his former supervisor, told Ramchandani that he had never seen evidence that Ramchandani engaged in collusion or price fixing and likewise recognized "that there was nothing criminal in Ramchandani's intent or actions." (Complaint ¶ 98 (brackets omitted).) Instead, Feig's sole concern was the tone and language of the communications. Regarding Ramchandani's criminal charges, Feig stated that after having reviewed the trial transcript, he was "shocked and appalled" that Ramchandani was indicted at all based on such minimal evidence, and he hoped the jury would see Ramchandani's innocence. (<u>Id.</u> ¶¶ 190-92.) After Ramchandani was acquitted, Feig wrote to him again, expressly acknowledging that:

> Citi facilitated the criminal charges by testifying in writing to the government that you were the single and sole violator of Citi's rules and that you committed a criminal act which they pled guilty to. This wasn't true at the time and certainly isn't with further evidence that has come through since the time of the plea.

(Id. ¶ 195.)[3]

Second, one of Citi's in-house lawyers, Paul Ferguson ("Ferguson"), volunteered at a meeting in February 2014 that, after reviewing the relevant records, he believed that Citi had no basis to accuse Ramchandani of intentionally wrongful conduct. Ferguson added that even if the chatroom communications violated certain unspecified Citi policies, he knew the breaches were unintentional and hoped to welcome Ramchandani back to Citi by the end of the year.

Ramchandani requested to meet with Ferguson again in October 2014, and Ferguson agreed. At that meeting, Ferguson reiterated his previous statements that Citi recognized Ramchandani had not engaged in any market manipulation. According to Ramchandani, Ferguson added that Citi would never admit to market manipulation because there was no evidence of it and that admitting to such misconduct without evidence would subject Citi to suit by its employees. Ferguson additionally offered to give Ramchandani a reference and added that he did "honestly believe [Ramchandani] never did anything intentional against the bank." (Complaint ¶ 136.) As

---

[3] Though not evidence of Ramchandani's innocence, the Complaint further alleges that once the press campaign had begun, Feig contacted French to express his anger that Citi had deliberately violated its assurances to Ramchandani that it would disclose only the fact of his dismissal and no more.

promised, Ferguson later provided Ramchandani a reference for employment at another financial institution.

Ramchandani further contends that Citi's conduct toward him in certain instances reflected the bank's understanding of his innocence. First, Ramchandani argues that the fact that Citi paid him severance was an indication that it did not believe he engaged in intentional or criminal conduct because under the terms of his employment agreement, severance would not be payable if he were dismissed for "gross misconduct" or "gross negligence." (Complaint ¶ 101.)

Moreover, Ramchandani alleges that his treatment starkly differed from the treatment of other Citi employees involved the FX Spot Market inquiries, including one employee who pled guilty to multiple felonies. In that case, according to Ramchandani, Citi managed to minimize press attention, evidencing Citi's ability to control the narrative and its intent to frame Ramchandani.

Lastly, Ramchandani asserts that on the day its plea agreement was announced, Citi's counsel openly described Ramchandani as "collateral damage." (Id. ¶ 181.)

B.    PROCEDURAL HISTROY

The DOJ investigation into the price-fixing conspiracy at Citi ended in a plea agreement on May 20, 2015.

Ramchandani's indictment in connection with that conspiracy was announced in January 2017 and he acquitted after trial in October 2018.

Ramchandani initiated this action on October 2, 2019. Before the deadline to answer or otherwise respond, and consistent with the Court's Individual Practices, on November 11, 2019, counsel for Citi wrote to Ramchandani regarding an anticipated motion to dismiss the Complaint. ("Premotion Letter," Dkt. No. 19.)

Citi argues that the Complaint must be dismissed because Ramchandani has failed to plausibly allege three of the four requisite elements of a malicious-prosecution claim. First, Citi argues that the DOJ independently decided to investigate and ultimately prosecute Ramchandani, and the Complaint does not plausibly allege that Citi "induced the prosecution and overtook the prosecutor's own volition." (Premotion Letter at 2 (citing Dantas v. Citigroup, Inc., No. 18 Civ. 2043, 2019 WL 2910682, at *5 (2d Cir. July 8, 2019)).) Second, Citi maintains that the DOJ had probable cause for the criminal charges against Ramchandani, and the Complaint fails to allege that the grand jury indictment was procured by fraud, perjury, suppression of evidence, or bad faith. Third, Citi contends that the Complaint fails to specifically allege

13

malice because Ramchandani has not identified any specific misstatements or falsified evidence the bank made or provided to the DOJ.

By letter dated November 20, 2019, Ramchandani responded to the Premotion Letter, disputing each of Citi's arguments. (See "Opposition," Dkt. No. 21.) First, Ramchandani argues that the Complaint pleads that Citi commenced a criminal proceeding against him by working "hand-in-glove with the Government" and "directly inducing" the DOJ to base its case on his purported wrongdoing, and that no more is required under New York law. (Id. at 2.) Second, Ramchandani argues that contrary to Citi's assertions, he has rebutted the presumption of probable cause by alleging that Citi acted in bad faith when it knowingly fabricated the evidence it provided to the DOJ. Third, Ramchandani contends that he sufficiently alleged malice because the Complaint describes a scheme by which Citi blamed all criminal wrongdoing on him to minimize its own exposure to broader and more serious consequences.

Citi advised the Court by letter dated November 27, 2019 that the parties' letter exchange had failed to resolve their dispute. (See "November 27 Letter," Dkt. No. 22.) Citi further reiterated its arguments for dismissal and responded to

14

Ramchandani's Opposition. In the November 27 Letter, Citi argues that none of the Complaint's allegations indicates that Citi's conduct rose to the level of overtaking the DOJ's volition. Citi insists that the DOJ independently investigated Ramchandani, and Ramchandani ignores the probative weight of both his indictment and that court's denial of his motion to dismiss the indictment. Citi lastly suggests that it cannot be found to have acted out of malice because its cooperation was part of its own guilty plea.

In response, Ramchandani filed a letter dated December 6, 2019 challenging the assertions in Citi's November 27 Letter. (See "December 6 Letter," Dkt. No. 23.) Ramchandani reiterates first his argument that Citi commenced the prosecution by playing an active role and giving advice and encouragement to the DOJ, which constitutes far more than simply cooperating. Second, he argues that Citi acted in bad faith, and thus cannot use either his indictment by grand jury or the denial of his motion to dismiss the indictment as a shield. Lastly, Ramchandani argues that the fact that Citi targeted him solely out of self-interest demonstrates malice.

## II.  **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

15

to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> In other words, a complaint should not be dismissed when the factual allegations sufficiently "raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555.

In resolving a Rule 12(b)(6) motion, the Court's task is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." <u>In re Initial Pub. Offering Sec. Litig.</u>, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted), <u>aff'd sub nom. Tenney v. Credit Suisse First Boston Corp.</u>, No. 05 Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006); <u>accord In re MF Glob. Holdings Ltd. Sec. Litig.</u>, 982 F. Supp. 2d 277, 302 (S.D.N.Y. 2013). In this context, the Court must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." <u>See Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 152 (2d Cir. 2002).

16

### III. <u>DISCUSSION</u>

To state a claim for malicious prosecution under New York law,[4] a plaintiff must allege "(1) the initiation of an action by the defendant against the plaintiff, (2) begun with malice, (3) without probable cause to believe it can succeed, (4) that ends in failure or, in other words, terminates in favor of the plaintiff." <u>Cornejo v. Bell</u>, 592 F.3d 121, 129 (2d Cir. 2010) (quoting <u>O'Brien v. Alexander</u>, 101 F.3d 1479, 1484 (2d Cir. 1996)). The fourth element is not in dispute as a jury acquitted Ramchandani. The Court therefore addresses the other three elements in turn.

A.   <u>INITIATION OF THE ACTION</u>

The parties dispute what exactly Ramchandani must allege to satisfy the requirement that the Defendants initiated the action. Ramchandani argues that under New York law, "liability will lie if defendant 'knew the information to be false, yet still gave it' to a prosecutor." (Opposition at 2 (quoting <u>Lupski v. County of Nassau</u>, 822 N.Y.S.2d 112, 114 (App. Div. 2006)) (internal alterations and emphasis omitted).) Citi, meanwhile, contends that the question is whether it "affirmatively induced the prosecution to the

---

[4] The parties do not dispute that New York law applies, and the Court is satisfied in this regard.

point of overtaking the prosecutor's volition." (November 27 Letter at 2 (citing Dantas, 779 F. App'x at 23).)

While New York courts have at various times used different tests for what constitutes the initiation of a criminal proceeding, the Court is persuaded that Ramchandani has the better interpretation. Furnishing false information to law enforcement authorities is sufficient to satisfy the first element of a malicious-prosecution claim when, at the time the information was furnished, the person providing it knew it to be false. See Chimurenga v. City of New York, 45 F. Supp. 2d 337, 343 (S.D.N.Y. 1999); Coscia v. El Jamal, 69 N.Y.S.3d 320, 324 (App. Div. 2017); Williams v. CVS Pharm., Inc., 6 N.Y.S.3d 78, 80-81 (App. Div. 2015); Maskantz v. Hayes, 832 N.Y.S.2d 566, 569 (App. Div. 2007). Applying this standard and drawing all reasonable inferences and resolving doubts in Ramchandani's favor, the Court concludes that this element has been sufficiently pled.

As a threshold matter, the Complaint provides a plausible basis to conclude that Citi provided information about Ramchandani to the DOJ. First, Ramchandani alleges that Citi told the FCA that Ramchandani was fired because, after reviewing his chatroom communications, Citi did "not feel comfortable" with Ramchandani's conduct. (Complaint ¶ 117.)

18

It is reasonable to infer, as Ramchandani maintains, that Citi made the same representation to the DOJ. Second, the DOJ's sentencing memorandum indicates that the DOJ heavily relied on Citi's cooperation in identifying "the most appropriate chatrooms and currencies." (Id. ¶ 164.) The DOJ further acknowledged that the chatroom communications "were often filled with dense jargon, describing highly technical trading strategies that were frequently conveyed in shorthand," requiring the DOJ to rely upon Citi's "valuable assistance" in decoding the chats, sometimes "line-by-line." (Id. ¶¶ 167-69.) Third, Ramchandani was indicted in connection with this investigation. In sum, Citi considered Ramchandani's chatroom communications problematic, and Citi cooperated with the DOJ by identifying relevant chatroom communications and decoding them. The reasonable inference when construing these allegations in the light most favorable to Ramchandani is that Ramchandani's communications were among those Citi identified and decoded for the DOJ. This inference is further supported by the allegations that, in providing assistance to the DOJ, Citi had motive and opportunity to do more than merely cooperate with the Government's investigation, but rather to influence the outcome to serve its own interest in minimizing its role in

19

the underlying financial scheme and shifting the blame to another. Because these facts suggest that a more complete evidentiary record would reveal evidence of the alleged wrongdoing, the issue is not one that could be properly resolved at this stage of the proceedings. See Fisher v. JPMorgan Chase Bank, N.A., 740 F. App'x 745, 746 (2d Cir. 2018) (quoting Twombly, 550 U.S. at 556) ("Plausibility 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the alleged wrongdoing."))

The thornier issue -- whether Citi's statements about Ramchandani to the DOJ were knowingly false -- is a close one, but the Court ultimately concludes that the allegations are sufficient to satisfy the pleading standard. See, e.g., Michaels v. MVP Health Care, Inc., 91 N.Y.S.3d 567, 573 (App. Div. 2018) (affirming the denial of a motion to dismiss when "Plaintiff alleged that defendants provided the authorities with information that defendants knew to be false and explained how they knew it to be false") (citing Lupski, 822 N.Y.S.2d at 112).

Ramchandani alleges that, in decoding his chatroom communications for the DOJ, Citi mischaracterized their

significance and misrepresented their "purportedly culpable meaning and intent." (Complaint ¶ 170.) The plea agreement Citi entered with the DOJ indicates that Citi participated in the price-fixing scheme "through one of its . . . traders." (Id. ¶ 156.) And Citi's sentencing memorandum asserted that its sole purported wrongdoer was "one Citi employee . . . based in London." (Id. ¶ 173.) Moreover, the Complaint quotes an email in which Ramchandani's former supervisor stated that Citi had testified that Ramchandani was "the single and sole violator of Citi's rules and that [he] committed a criminal act." (Id. ¶ 195.) While Ramchandani was not the only trader implicated in the alleged conspiracy (see id. ¶¶ 14, 80, 127-28), affording him the benefit of every reasonable inference, it is at least plausible that Ramchandani is the "one" trader referenced, and thus, Citi communicated to the DOJ that he was involved in market manipulation.

As to whether Citi knew these statements to be false, the Court is again persuaded that at this stage Ramchandani's allegations are sufficient to overcome a motion to dismiss. Ramchandani alleges when he was suspended, his direct supervisor, Feig, told Ramchandani that he was being suspended pending an internal investigation and that "no decision about wrongdoing ha[d] been made." (Id. ¶ 69.) Then,

21

when he was ultimately fired a few months later, Citi told
Ramchandani that it had not yet reached "any conclusions
regarding the matters being investigated." (Id. ¶ 95.) Even
more significantly, upon his termination, Ramchandani alleges
that Citi paid him severance, which would not have been
payable had he been dismissed for "gross misconduct" or "gross
negligence." (Id. ¶ 101.) Furthermore, in-house counsel
offered to provide Ramchandani a reference for employment as
a trader at another financial institution. The same in-house
counsel told Ramchandani that Citi recognized that he had not
engaged in market manipulation and would "never make an
admission of market manipulation to the regulators because
there is no evidence of that." (Id. ¶ 134-35.) Together, these
allegations are sufficiently specific to carry Ramchandani's
claim past mere speculation.

Moreover, Ramchandani alleges that following his trial,
Feig emailed him saying he was "shocked and appalled" that
Ramchandani had been indicted at all. (Id. ¶ 191.) After
Ramchandani was acquitted, Feig emailed again, sharing his
personal view that "Citi facilitated the criminal charges by
testifying" that Ramchandani was "the single and sole
violator of Citi's rules and that [Ramchandani] committed a
criminal act," and adding that, "[t]his wasn't true at the

time and certainly isn't with further evidence." (Id. ¶ 195.)
This allegation, viewed in the light most favorable to
Ramchandani, presents additional support for his claim.

Here, the allegations that Citi cooperated with the DOJ,
explained the purportedly culpable meaning of the chats, and
grounded Citi's liability on the conduct of "one" trader in
London, together provide a plausible basis to reasonably
infer that Citi told the DOJ that Ramchandani had engaged in
wrongdoing. Moreover, the Complaint alleges that Citi
repeatedly told Ramchandani that it had not drawn any
conclusions, paid him severance for which he would have been
ineligible had he been guilty of "gross misconduct," told
Ramchandani through in-house counsel that there was no
evidence of market manipulation at the bank, and offered him
a reference to work at another financial institution.
Affording Ramchandani the benefit of all reasonable
inferences and resolving any doubts in his favor, these
allegations suggest that when Citi told the DOJ that
Ramchandani had engaged in wrongdoing, it knew this
information was false and so acted in order to serve its
interest in minimizing liability and public exposure.
Especially at this stage, when the Court is assessing only
the legal feasibility of Ramchandani's claim, and not the

weight of the evidence, these allegations constitute enough to sustain the first element of a malicious-prosecution claim.

B.    LACK OF PROBABLE CAUSE

To succeed on a claim for malicious prosecution under New York law, Ramchandani must also plausibly allege that the criminal charges brought against him lacked probable cause. As relevant here, "indictment by a grand jury creates a presumption of probable cause." Manganiello v. City of New York, 612 F.3d 149, 161-62 (2d Cir. 2010) (alteration, citations, and internal quotation marks omitted). This element is based on the principle that "the Grand Jury acts judicially and it may be presumed that it has acted regularly." Colon v. City of New York, 455 N.E.2d 1248, 1250 (N.Y. 1983). "Th[e] presumption may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Manganiello, 612 F.3d at 162 (citations and internal quotation marks omitted); see also Richards v. City of New York, No. 97 Civ. 7990, 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003) ("New York law thus strips an indictment of its presumptive force in a malicious

prosecution action when the indictment was obtained through improper means.").

As an initial matter, the Court finds unavailing Citi's argument that "[p]robable cause is further established" by the denial of Ramchandani's motion to dismiss the indictment. (Premotion Letter at 3 n.3 (citing United States v. Usher, No. 17 CR 19, 2018 WL 2424555, at *9 (S.D.N.Y. May 4, 2018)).) While this fact certainly heightens Ramchandani's challenge, nonetheless the standard to sustain a motion to dismiss an indictment is high. As the district court put it in Ramchandani's criminal case, dismissal is "an extraordinary remedy" and "reserved only for extremely limited circumstances implicating fundamental rights." Usher, 2018 WL 2424555, at *3 (quoting United States v. De La Pava, 268 F.3d 157, 165 (2d Cir. 2001)). The denial of Ramchandani's motion to dismiss the indictment in his criminal case does not, therefore, necessarily establish that the charges against him were supported by probable cause.

The Court is persuaded that Ramchandani has plausibly alleged that Citi's improper self-serving motive in procuring Ramchandani's indictment rebuts the presumption of probable cause. Ramchandani claims that Citi mischaracterized his chatroom communications and told the DOJ that he was

25

criminally liable for price-fixing based on those communications. Citi allegedly made these false representations because doing so would limit its liability to a single wrongdoer, thereby shielding the bank from large-scale consequences. That the DOJ could not decode the chats without Citi's assistance, as indicated in the DOJ's sentencing memorandum, is enough to support a plausible inference that the indictment was "procured" based on Citi's false statements, which in turn stemmed from an improper motive. Taking these allegations as true, and construing the Complaint liberally, the facts raise a plausible entitlement to relief, such that the dismissal is not proper at this stage of the litigation.

C.   MALICE

The third prong is "actual malice." Lupski, 822 N.Y.S.2d at 113. Under New York law, "malice does not have to be actual spite or hatred." Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996). Instead, malice means only "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." Fowler v. Kingston City Police Dep't, No. 07 Civ. 873, 2009 WL 3064775, at *8 (N.D.N.Y. Sept. 22, 2009) (citations omitted).

Here, Ramchandani alleges that Citi had an "improper motive" in providing information about him to the DOJ. Namely, it was in Citi's interest to minimize its own wrongdoing by turning on Ramchandani, scapegoating him by falsely claiming that Citi's culpability was limited to the acts of one individual. These claims are supported by factual allegations that Citi explicitly represented to the DOJ in its sentencing memorandum that its sole purported wrongdoer was "one Citi employee . . . based in London." (Complaint ¶ 173.) Similarly, the Complaint references a Citi letter to the SEC seeking to avoid sanctions in which Citi asserted that its criminal liability arose from "isolated acts by one employee." (Id. ¶ 176.) Taken together, and viewed in the light most favorable to Ramchandani, these allegations suggest that Citi was motivated by "something other than a desire to see the ends of justice served.'" Fowler, 2009 WL 3064775, at *8. Contrary to Defendants' argument,[5] such statements constitute enough to render Ramchandani's claim plausible at the pleading stage.

## IV.  ORDER

Accordingly, for the reasons stated above, it is hereby

---

[5] The Court notes that while fraud or mistake must be pled with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

**ORDERED** that the motion so deemed by the Court as filed by defendants CitiBank National Association, CitiGroup Inc., and Citicorp (Dkt. Nos. 19 and 22) to dismiss the Complaint of plaintiff Rohan Ramchandani (Dkt. No. 17) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **DENIED.**


**SO ORDERED.**

Dated:     New York, New York
           11 March 2021

                                        _____
                                            Victor Marrero
                                               U.S.D.J.