# EXHIBIT A

IN THE EAST LONDON EMPLOYMENT TRIBUNAL                    Claim Number 3200403/2014

B E T W E E N:

### ROHAN RAMCHANDANI

**Claimant**

and

### CITIBANK N.A.

**Respondent**

---

### WITNESS STATEMENT OF
### KHURRAM SHAMSEE

---

I, Khurram Shamsee, of DAC Beachcroft LLP, The Walbrook Building, 25 Walbrook, London EC4N 8AF, will say as follows:

1. I make this witness statement in answer to the Claimant's application for specific disclosure made on 13 June 2019 ("**the Application**"). Save as from the context otherwise appears, the facts and matters to which I refer in this statement lie within my own knowledge or have otherwise come to my attention in the course of acting for the Respondent in this matter. Those facts and matters are true to the best of my knowledge, information and belief.

2. I am a partner and Head of the London Employment Department at DAC Beachcroft LLP ("**DACB**"). My firm has been instructed by the Respondent in this claim since December 2018. By way of background, I have acted for the Respondent and its group companies on employment matters since 2006. I have prepared this witness statement to assist the Employment Tribunal in considering the Application at the Preliminary Hearing on 15 August 2019 ("**PH**").

**Background to the Claimant's Application**

3. The Tribunal will gather the factual background to this case from the pleadings. In very brief summary, the Claimant was the Managing Director and Head of EMEA G10 Spot Foreign Exchange Trading at the Respondent until his dismissal on 10 January 2014. It is the Respondent's case that he was dismissed for his inappropriate conduct with forex traders at other banks in chat rooms between 2008 and 2012. He complained of unfair dismissal. His claim was stayed for a number of years because of criminal proceedings against him in the United States, arising out of overlapping factual circumstances. In October 2018, the Claimant was acquitted of the criminal charges by a jury against the US criminal standard of proof. The stay on his Tribunal Claim was subsequently lifted. The Respondent conceded procedural unfair dismissal and, in February 2019, a 7 day trial to determine the question of remedy was listed to commence on 12 November 2019. It is the Respondent's position that even though the dismissal was procedurally unfair, it was substantively justified having regard to the Claimant's conduct, he caused and/or contributed to his dismissal by his blameworthy conduct, the following of a different (proper) procedure would have made no difference to the final outcome, and/or it is not just and equitable that he receive compensation.

4. On 5 April 2019 the Claimant's solicitors sent our firm an e-mail attaching a list of 32 documents or categories of documents. The covering e-mail simply stated that the Claimant expected to see these documents included in the Respondent's disclosure; it did not provide any further explanation in relation to how these documents were relevant to the issues to be determined in these proceedings, and in the majority of cases this was not apparent from the descriptions provided. We did not respond to this list in any detail at this stage as we were focussing on assisting the Respondent with the extensive task of completing its searches for the purposes of standard disclosure, which I describe in further detail below.

5. Standard disclosure took place on 31 May 2019 further to an extension granted by Employment Judge Prichard.

6. On 10 June 2019, the Claimant's solicitors wrote to this firm asserting that full disclosure had not been given and re-attaching the list provided on 5 April 2019 in support of that

contention. Once again, that letter did not set out any explanation of the relevance of the documents requested to the issues in dispute; nor did it explain why the disclosure of the requested documents was necessary for the fair disposal of these proceedings. In their covering letter, the Claimant's solicitors added a further, extensive request for the disclosure of chats with two customers over a five year period, again with no explanation as to the relevance of these particular chats to the issues in dispute.

7. Just three days later on 13 June 2019 the Claimant made an application to the Employment Tribunal for the specific disclosure of all of the documents cited in their earlier correspondence. This application set out for the first time an extremely brief form of explanation (one line) of the relevance of the documents to the issues (albeit that this explanation was inadequate); it did not, however, provide any explanation for why their disclosure was necessary for the fair disposal of these proceedings. The application also sought the disclosure of a further 15 documents or categories of documents which had not previously been requested from the Respondent.

8. DACB responded to the Claimant's application on 28 June 2019, highlighting that the application included only sparse details on the relevance of the requested documents, and no explanation at all on why their disclosure was necessary for the fair disposal of these proceedings. Our response made a number of general observations in relation to the categories of documents requested, and we invited the Claimant to reconsider his application in light of this response.

9. I would note in relation to the broader context of this dispute that the Claimant has threatened a wide range of additional claims against the Respondent and its group companies, including for breach of contract in the High Court in respect of bonus and stock awards, defamation and a breach of his privacy rights. In their letter dated 20 February 2019, the Claimant's solicitors suggested claims would be issued before the High Court if an agreement was not reached between the parties by 20 March 2019, and that the Claimant would apply for a further stay of the Employment Tribunal proceedings. (In the event these claims were not issued). Furthermore, on 10 June 2019 the Claimant's solicitors sought permission for the release of certain of the Respondent's disclosure documents for use in related data protection / privacy claims, and claims in respect of stock. I mention this correspondence as, of course, it would not be appropriate for the Claimant to use a specific

disclosure application in these proceedings in order to obtain access to documents to be used in separate proceedings against the Respondent.

**The Respondent's Position on the Application**

10. On the afternoon of Friday 9 August 2019, the Claimant's solicitors served Counsel's skeleton argument in support of the Application ("the Claimant's Skeleton"). At that time, this statement was in the course of preparation. The Claimant's Skeleton set out (for the first time) a coherent explanation as to the relevance of certain of the documents sought in as part of the Application. Having considered the Claimant's Skeleton, the Respondent agrees to provide on a voluntary basis within 14 days of the PH the documents requested at 1, 3 to 6, 9, 11, 13, 14, 16, 18 to 20, 22 to 25 and 34. This should not be taken as acceptance of the contentions made about these documents in the Claimant's Skeleton. In broad terms the Claimant asserts that these individual chats demonstrate management knowledge of his conduct and his compliance with instructions; the Respondent acknowledges that members of the Respondent's management team are either a party to these chats or otherwise referenced in them. For the avoidance of doubt, the Respondent disputes the interpretation put on these chats by the Claimant. However, these are matters that will be addressed at the remedy hearing.

11. Requests 7, 8, 12, 30, 32, 33, 43 and 44 are not pursued. This statement deals with the balance of the requests and sets out the Respondent's position in relation to them. First, it may be helpful if I explain the disclosure process that the Respondent has undertaken to date.

**The Respondent's Standard Disclosure**

12. This firm was heavily involved in assisting the Respondent to complete its standard disclosure for the purposes of these proceedings. I have summarised below the steps taken to ensure the Respondent met its obligations to complete a reasonable and proportionate search for documents on the basis that this may be relevant to the Tribunal's assessment of the Claimant's specific disclosure requests.

*Electronic Searches*

4

13. The Respondent identified the key individuals internally who had been involved in interactions and decision-making in relation to the Claimant's suspension and dismissal. The Respondent identified 25 individuals within its Compensation, HR, Press and Legal teams, as well as the business line / management chain relevant to the Claimant ("**custodians**"). This included both employees of the Respondent and its associated companies registered in the US.

14. This firm prepared search parameters (namely a combination of keywords and date ranges) in order to retrieve electronic communications sent or received by these custodians over the relevant period around the termination of the Claimant's employment from the Respondent's archives. The Respondent's document management team applied these search parameters to retrieve responsive items from the archives, which were then subject to a de-duplication exercise.

15. Approximately 10,000 responsive communications were released to this firm and subject to further searches and review in order to identify documents relevant to the issues in dispute.

*Manual Searches*

16. Separately, individuals within the Respondent's legal and HR teams were instructed to carry out a manual search of their own files and to provide copies of all relevant documents relating to the Claimant covering the period both leading up to and following his dismissal.

17. The Respondent's legal advisers at the point of the Claimant's dismissal (Allen & Overy LLP) also conducted a search for documents relating to the Claimant and provided the results to this firm.

18. With respect to both the electronic and manual searches, experienced solicitors at this firm led the exercise of identifying documents which are relevant to the issues in dispute, and also assessing if the Respondent could properly claim legal professional privilege on any particular document.

19. The disclosure exercise was an extensive task and we sought an extension to the original deadline for disclosure of 18 April 2019 to ensure that it could be properly completed. The Employment Tribunal granted this extension, albeit that the parties were notified about the extension once our proposed amended deadline of 31 May 2019 had passed.

20. The Respondent's disclosure comprised five lever arch files containing contemporaneous

documents, copies of relevant policies and procedures and copies of the Bloomberg chats referred to in its Amended Grounds of Resistance.

### Documents relating to the decision to terminate the Claimant's employment

21. I acknowledge that the Respondent's disclosure did not include a significant number of documents relating to the decision making process which underpinned the termination of the Claimant's employment in January 2014. However, this is a somewhat unusual case.

22. Firstly, the Respondent has conceded that it was unable to follow a fair procedure given the strictures imposed by its regulator, which otherwise would have generated the usual body of documents relevant to a disciplinary process (such as meeting notes and a detailed outcome letter etc), including at any appeal stage.

23. Furthermore, it is well documented that over the course of 2013, the Financial Conduct Authority (FCA), the US Department of Justice (DOJ) and other regulators across the globe commenced extensive investigations into FX Spot trading across the industry, including at the Respondent and its group companies. As noted above, he Claimant was Head of the EMEA G10 Spot Foreign trading desk at this time, and he was one of three employees named in press articles relating to the alleged misuse of chat rooms. The FCA first contacted the Respondent in October 2013 to explain that it was conducting an investigation into FX Spot Trading and to seek the disclosure of relevant documents. This was prior to the Respondent's decision to ask the Claimant to take a period of paid leave whilst it carried out an internal investigation. The FCA identified the Claimant as a key person of interest to its investigation by November 2013.

24. As such, the Respondent's internal and external legal counsel were heavily involved from a very early stage in the discussions in relation to the Claimant and his employment in order to provide legal advice. Key decisions relating to the Claimant were determined in the course of taking this legal advice, and the Respondent asserts legal privilege over the related communications.

25. I can confirm that my firm has reviewed the relevant communications and that legal advice privilege has been properly asserted over the documents which have been withheld. On this point I would note that the content of the communications has been carefully

considered, and not just the application of a "privileged" label; for this reason, a number of the Respondent's communications marked "legally privileged" (or similar) were included in its disclosure as their content did not pertain to the giving or receiving of legal advice.

**Disputed Requests**

Documents which cannot be located (Requests 2, 4 and 15)

26. I can confirm that the Respondent has repeated its search for document request 2 (6 October 2009 chat between the Claimant, Matt Gardiner and Richard Usher) and request 15 (Bloomberg chat between the Claimant, Matt Gardiner, Chris Ashton and Richard Usher on 13 April 2012) and documents matching these descriptions could not be located.

27. In relation to request 4, we have noted the correction to the relevant date (email from Anil Prasad to *FXLM Senior Trading Managers on 31 January 2013 with Subject Line: Chats with Other Banks). The Respondent has located this document and is content to disclose it on a voluntary basis within 14 days of the PH.

Documents which are not relevant to the issues (Request 17 and 21)

28. The Claimant has requested a chat between him, Matt Gardiner, Chris Ashton and Richard Usher on 31 July 2012 (request 17) and a chat between him and Suzanna Barrett (his girlfriend at the time) on 30 January 2008 (item 21) which he suggests show the legitimate business purpose for the exchange of information in accordance with management practice. The Claimant's more senior managers are not a party to either of these chats and/or their practice and knowledge of the Claimant's practice is not referenced in the context of these chats. In relation to item 21 it is difficult to see understand how a chat between the Claimant and his girlfriend (a junior trader on the desk) can have any probative value to the Tribunal when assessing the Claimant's conduct.

Document protected by litigation privilege (Request 10)

29. The Claimant has requested at item 10 a copy of the Respondent's "*notes of the 15 October 2013 meeting where the Claimant, Paul Ferguson and Cleary Gottleib [sic] were present*".

7

By way of background to this request, Paul Ferguson is a member of the Respondent's internal legal team and Cleary Gottlieb Steen & Hamilton LLP ("**Cleary Gottlieb**") are the Respondent's external US regulatory lawyers.

30. The Claimant was interviewed in the context of the FCA notifying the Respondent on 9 October 2013 that it was investigating "allegations of FX fix manipulation", and the reports in the media in relation to this investigation and the inappropriate conduct which was alleged to have taken place in a Bloomberg chatroom known as "The Cartel". On 15 October 2013 the FCA sent the Respondent a lengthy information request in connection with its investigation. On 16 October 2013 the FCA notified the Respondent that its Enforcement team had commenced investigation through a formal Notice of Appointment of Investigators.

31. Cleary Gottlieb led the investigatory interview with the Claimant on 15 October 2013 with Mr Ferguson present. The Respondent asserts litigation privilege over the notes of this interview on the basis that prosecution and/or litigation was in reasonable contemplation, and that these notes amount to communications prepared for the purposes of such proceedings.

Project Lion Materials (Request 26)

32. The Claimant's request at item 26 is for *"All chats considered by the Respondent as part of the Project Lion Review in summer of 2013 and the outcome of that review"*.

33. As already explained in our letter to the Tribunal of 28 June 2019, Project Lion was an earlier, separate review conducted by the Respondent's external counsel (Eversheds Sutherland LLP). Significantly, the Claimant's chats were not considered as part of this review and he was not dismissed as a consequence of any findings arising out of Project Lion.

34. In the Claimant's Skeleton, the request has been refined to seek the disclosure of the chats involving Simon Hamilton, one of the Claimant's direct reports, but no explanation is provided about how Mr Hamilton's participation in chats is relevant to the issues the Employment Tribunal will be required to consider in these proceedings.

35. In terms of the request for the disclosure of the review outcome report, this report was

prepared by Eversheds Sutherland LLP. It has been reviewed by this firm. It constitutes legal advice to the Respondent, in respect of which the Respondent asserts legal advice privilege.

Trading Data (Request 31)

36. At request 31 the Claimant seeks "*All trading data for [the Claimant's] warehouse on chats identified in Appendix 5 & 6. Trading Data for 22 February 2012 as well*". The request is explained on the basis that the Respondent has made serious allegations of market manipulation in that "*it is said that [the Claimant] co-ordinated trading strategy or stood down in trades in co-ordination, with traders at other banks*" (paragraph 56 of the Claimant's Skeleton).

37. This misrepresents the position. The Respondent's contentions in relation to the Claimant's misconduct as set out in its Grounds of Resistance are based on his conduct as demonstrated within the chats, and not on his trading activity. Specifically:

    (a) Paragraph 13, (5th bullet) of the Amended Grounds of Resistance states "*the Claimant said he would trade with the apparent intention of moving down the price at the time of the Respondent's "Bench Snapshot"*" and the Respondent relies on the content of a chat dated 22 February 2012;

    (b) paragraph 36.(e) of the Amended Grounds of Resistance states "*The Claimant occasionally indicated to traders at other banks that he would seek to co-ordinate with them his trading of the EUR/USD currency pair.....*" and the Respondent relies on the content of the chats cited in Appendix 5;

    (c) paragraph 36.(f) of the Amended Grounds of Resistance states "*The Claimant occasionally indicated to traders at other banks that he would seek to withhold bids or offers when a trader an another bank apparently held an open risk position....*" and the Respondent relies on the content of the chats are cited in Appendix 6.

38. As such, the Respondent will refer to the Claimant's comments as set out in each of these chats and will argue that these amounts to gross misconduct when considering the Claimant's contractual obligations and its policies. In this context, it will be of no probative

9

value to the Employment Tribunal to invest the time needed to understand the Claimant's trading activity and attempting to evaluate this activity against the comments which he made in his chats on any given day.

Customer Chats with APG and PGGM (Request 35)

39. Request 35 is for "*Customer chats with APG and PGGM for the period 1 January 2008 to 31 December 2012 limited to the last working day of each month*". Having conducted an indicative search into this category of documents, and contrary to the suggestion at paragraph 59 of Claimant's Skeleton, the Respondent has identified several thousand chats that meet this description. Many of those chats involve a significant number of participants (up to four thousand in some cases). This firm has reviewed a small selection of these documents, none of which we have identified as containing any substance of relevance to the issues in dispute.

40. I understand from the Claimant's Skeleton that this request is, in fact, limited to chats in which he was a participant. This was not apparent from the original request. We understand that limiting the request in this way will still lead to an extensive set of results given the five year time period covered by the request. Indeed, the Respondent has run a further search and identified over 800 chats with these two clients which took place on the month end date over the five year period and which involved the Claimant.

41. The Claimant has suggested these chats will show employees of the Respondent regularly sharing the same types of information for which he is criticised. The Claimant has not specified which employees were allegedly involved and their seniority (noting that the Claimant was a Managing Director and the relevant desk head), or precisely what information was shared (with reference to the specific allegations around information sharing set out in the Amended Grounds of Resistance). The Respondent suggests that this request remains broad and imprecise and that the disclosure of these chats (containing extensive client confidential information) is not necessary for the fair disposal of these proceedings.

Communications between the Respondent and its US group entities (Requests 36 to 42 and 45)

42. The Claimant has requested a number of categories of documents that each relate to correspondence between the Respondent and its US group entities, being requests 36, 37, 38, 39, 40, 41, 42 and 45.

43. As part of the Respondent's standard disclosure searches, the Respondent conducted searches of intra-group communications between the key custodians identified, covering the period leading up to the Claimant's suspension and subsequent dismissal. This included custodians based outside of the UK, including business managers, HR professionals and in-house legal counsel employed by its US group entities. This firm reviewed the results of those searches and copies of the documents relevant to the issues in dispute were provided to the Claimant on 31 May 2019.

44. There is nothing further to disclose in this category. In relation to the criticisms in the Claimant's Skeleton at paragraph 61 in relation to the lack of documents relating to the decision making process on the Claimant's dismissal, I repeat my comments at paragraphs 21 to 25 that many of the discussions relating to the Claimant's employment and its termination were carried out in the context of the provision of legal advice from the Respondent's internal and external counsel, and that the Respondent asserts legal advice privilege over these communications.

Communications with the DOJ (Requests 27, 28, 29 and 46)

45. The Claimant's application includes a series of requests which relate to the Respondent's correspondence with the DOJ, that preceded the making of the Plea Agreement. Citicorp entered into a plea agreement with the DOJ on 20 May 2015, pursuant to which it accepted a guilty plea and agreed to pay a criminal fine of $925 million. Three other banks with employees who participated in the EUR/USD chat room also entered into guilty pleas and paid fines based on the conduct in that chat room.

46. The requests made are extensive. They extend to the notes of a presentation that the Respondent is said to have made to the DOJ in March 2014 and notes of a plea meeting on the same date, and (e.g.) a letter Cleary Gotlieb wrote to the Associate Attorney General in April 2015. They also extend to all submissions made by the Respondent or connected

entities to the DOJ regarding the Claimant's conduct. All of the requests relate to events that post-date the Claimant's dismissal.

47. I make the preliminary point that the communications requested were not between the Respondent and the DOJ, but between Citicorp and the DOJ. As such, they are not the Respondent's documents to disclose. This notwithstanding, however, the Respondent's searches for standard disclosure as summarised above did not identify any communications between the Respondent (and related entities) and the DOJ which related to the Claimant in the period leading up to and immediately following the termination of his employment. The searches did identify a number of communications between the Respondent and the FCA which have been disclosed to the Claimant (further to confirmation from the FCA that it would not seek to raise an objection to their disclosure). I understand that the Claimant is now satisfied with the Respondent's disclosure covering its correspondence with the FCA as it related to him, and request number 30 is no longer pursued.

48. At paragraph 52 of the Claimant's Skeleton the relevance of the communications with the DOJ is explained by reference to the fact the Respondent has expressly pleaded the Plea Agreement in its Amended Grounds of Resistance *"as purportedly relevant to determining the alleged misconduct of the Claimant"*. This misrepresents the position. At paragraph 37 of the Amended Grounds of Resistance it is simply noted as a matter of fact that material aspects of the Claimant's conduct were directly relevant and contributed to the FCA Final Notice and the Plea Agreement. This is both relevant context for the Employment Tribunal and relevant to the Claimant's claim for reinstatement / re-engagement. The Respondent has not pleaded that the Plea Agreement was or is relevant to determining the alleged misconduct of the Claimant.

**Statement of Truth**

I believe the facts stated in this witness statement are true.

-----------------------------------

**Khurram Shamsee**