# EXHIBIT A

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/19/2023
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ROHAN RAMCHANDANI,

                    Plaintiff,

       - against -

CITIBANK NATIONAL ASSOCIATION,
CITIGROUP INC., and CITICORP,

                Defendants.

---

**19 Civ. 9124 (VM)**

**DECISION AND ORDER**

---

**VICTOR MARRERO, United States District Judge.**

Defendants CitiBank National Association, CitiGroup Inc., and Citicorp (together, "Citi" or "Defendants") move for summary judgment in this action, arguing there is no genuine dispute as to any material fact related to the malicious prosecution claims brought by plaintiff Rohan Ramchandani ("Ramchandani") and that dismissal, with prejudice, of those claims is warranted. (See "Motion," Dkt. No. 144; "Br.," Dkt. Nos. 145, 149.) Ramchandani opposes Citi's Motion. (See "Opp.," Dkt. No. 158, 171.) And Citi subsequently filed a reply in support of its Motion. (See "Reply," Dkt. Nos. 160, 163.)[1]

---

[1] The Court includes, where applicable, citations to both the public and sealed versions of the parties' submissions. The Court previously granted the parties permission to file portions of their briefs, Local Rule 56.1 Statements of Undisputed Facts, and their exhibits under seal due to the highly confidential information, including grand jury testimony from the underlying criminal prosecution of Ramchandani, contained within. (See, e.g., Dkt. Nos. 153, 157, 167.)

1

In prior proceedings, by a Decision and Order dated March 11, 2021, the Court denied, based on the pre-motion letters filed, Citi's motion to dismiss Ramchandani's complaint, concluding that the allegations stated therein, if true, satisfied the elements of a malicious prosecution claim. See Ramchandani v. CitiBank Nat'l Ass'n, No. 19 Civ. 9124, 2021 WL 930627 (S.D.N.Y. Mar. 11, 2021) (hereinafter, "Ramchandani I"). Now, with the benefit of discovery and a full record, and for the reasons stated below, the Court finds that summary judgment is appropriate. Therefore, Citi's Motion is **GRANTED**, and the case is **DISMISSED**.

## I.   BACKGROUND

### A.   FACTUAL BACKGROUND[2]

#### 1.   The Internal Investigations

Rohan Ramchandani was a London-based foreign exchange spot market ("FX Spot Market") trader for Citi, focusing on

---

[2] Except as otherwise noted, the factual background derives from the undisputed facts as set forth by the parties in their respective Local Rule 56.1 Statement and Counterstatement of Undisputed Material Facts and the responses thereto, as well as the accompanying declarations and exhibits provided in support and the factual record submitted. These include Citi's Statement of Undisputed Material Facts ("Citi 56.1 Stmt.," Dkt. Nos. 146, 150); the Declaration of Marshall H. Fishman ("Fishman Decl.," Dkt. Nos. 147, 151); Ramchandani's Response to the Citi 56.1 Stmt. ("Ramchandani 56.1 Resp.," Dkt. Nos. 158-3, 171-3); Ramchandani's Counterstatement of Undisputed Material Facts ("Ramchandani 56.1 CS," Dkt. Nos. 158-3, 171-3); the Declaration of Gary Greenberg ("Greenberg Decl.," Dkt. Nos. 158-1, 171-1); Citi's Reply Statement of Undisputed Material Facts ("Citi Reply 56.1 Stmt.," Dkt. Nos. 161, 164); and the Supplemental Declaration of Marshall Fishman ("Fishman Suppl. Decl.," Dkt. Nos. 162, 165). No further citations to these documents will be made herein except as specifically referenced. The Court construes any disputed facts discussed in this section and the justifiable inferences arising

the Euro/U.S. dollar ("EUR/USD") currency pair until January 2014. The FX Spot Market is a global, over the counter, market where participants trade currencies against one another in pairs. The EUR/USD currency pair is the largest market by trade volume, occasionally exceeding $500 billion per day. By 2010, Citi promoted Ramchandani to the position of Managing Director, making him the Head of Citi's G10 Spot FX Trading Desk in London.[3]

Prior to 2014, FX Spot traders frequently participated in interbank chatrooms. In those chatrooms, typically hosted by Bloomberg LP ("Bloomberg"), traders discussed the FX Spot Market, and used the chats to provide color on the market and facilitate trading. Transcripts of these interbank chats are maintained and available for review by banks, including Citi, and, to the extent applicable, regulators.

In or around December 2007, Ramchandani joined an interbank chatroom focused on only the EUR/USD FX market (the "EUR/USD Chatroom" or the "Chatroom"). Eventually, the

---

therefrom in the light most favorable to the non-moving party, Ramchandani, as required under the standard set forth below in Section II.

[3] Following this promotion, Citi designated Ramchandani as a "Code Staff" employee, which is a designation given to those "who have a significant impact on [a] firm's risk profile" by the United Kingdom's Financial Conduct Authority ("FCA"). (See Citi 56.1 Stmt. ¶ 5.)

Chatroom would come to comprise three other traders:[4] Matthew Gardiner ("Gardiner"), a former FX trader at Union Bank of Switzerland ("UBS") and Barclays PLC ("Barclays"); Christopher Ashton ("Ashton"), a former FX trader at Barclays; and Richard Usher ("Usher"), a former FX trader at JPMorgan Chase ("JPMorgan") and The Royal Bank of Scotland ("RBS"). From time to time, the members of the Chatroom referred to themselves as the "Mafia," the "Cartel," and the "Bandit's Club." (See Citi 56.1 Stmt. ¶ 10.) Ramchandani was the only Citi employee in the Chatroom.

In the Summer and Fall of 2013, chatrooms like the EUR/USD were scrutinized for potential antitrust violations by the United States Department of Justice Antitrust Division ("DOJ"), the United Kingdom's Financial Conduct Authority, and the press. In June 2013, media outlets began reporting on alleged manipulation of FX rates (known as "fixes" or the "fix") in various FX Spot Markets. Then in September 2013, UBS, which was, at the time, subject to a non-prosecution agreement, voluntarily self-reported to the DOJ conduct it had discovered through an internal investigation. That investigation revealed potential collusion between UBS

---

[4] Initially, the Chatroom included Ramchandani, Gardiner, and Usher. Later on, and after internal discussion amongst the Chatroom's founding members, Ashton entered the chat.

employees and several other banks regarding the FX Spot Market.

Coinciding with UBS's disclosure, Citi launched its own internal investigation into FX trading practices at the bank. As part of that investigation, in October 2013, Paul Ferguson ("Ferguson"), a Managing Director and Senior Litigation Counsel at Citi, and Citi's outside counsel from Cleary Gottlieb Steen & Hamilton LLP ("Cleary"), jointly interviewed Ramchandani. The Chatroom was a topic of discussion at the interview. Ramchandani offered to explain the substance of the chat to Ferguson and Cleary, but they declined his offer. Instead, Citi would approach Jeff Feig ("Feig"), Ramchandani's direct supervisor and Citi's Global Head of FX, for help decoding the Chatroom's messages. Feig then spent "hundreds" of hours with lawyers from Cleary reviewing "thousands and thousands" of chatroom communications to help Citi and Cleary decode and interpret the meaning of the chats, including Ramchandani's. (See Ramchandani 56.1 CS ¶ 10.)

As a result of growing press scrutiny and Citi's review of the Chatroom, Citi took employment action against Ramchandani. On or about October 30, 2013, Citi placed Ramchandani on temporary leave due to press reports connecting him to the currency manipulation allegation. Citi told Ramchandani that his leave would last only three weeks,

with full pay and benefits, but it was later extended while Citi continued its investigation. Then, on January 10, 2014, Citi terminated Ramchandani's employment. The investigation into the Chatroom left Citi's executives uncomfortable with Ramchandani's conduct. Feig would later describe Ramchandani's Chatroom activities as "problematic," (see Fishman Suppl. Decl., Ex. 36, 60:14-61:17) and told Ramchandani, in an email, that "there was a rationale to dismiss you," (see Greenberg Decl., Ex. YY at 1). James Forese ("Forese"), the Citi senior executive who, with Paco Ybarra, another Citi executive, made the decision to dismiss Ramchandani, had serious concerns with the Chatroom's contents. He cited Ramchandani's sharing of confidential information with non-Citi traders, and Ramchandani's apparent loyalty to the other members of the Chatroom over Citi as grounds for firing Ramchandani. Forese believed Ramchandani's actions were a material violation of Citi's internal code of conduct.

Ramchandani's dismissal became the subject of press reports. Following his termination, Citi's public relations ("PR") team had reached out, on background, to Bloomberg and other news outlets -- which had been generally reporting on the DOJ's FX investigation -- to confirm that Ramchandani was no longer at Citi. This outreach was part of what Jeffrey

French ("French"), a Citi PR Executive, described initially as a "'no fingerprints' concept" he had been working on regarding press strategy. But that concept, apparently, never came to fruition. (See Greenberg Decl., Ex. W at 5.) French characterized the more open approach that Citi PR adopted as "[m]uch easier" because Citi would be "seen confirming that [it] took a proactive step." (Id.)

The PR strategy was fumbled. Citi had been approved only to confirm to news outlets that Ramchandani was "no longer with the firm." (Id. Ex. X at 2.) The media, instead, took that confirmation out of context and reported that Citi had told the reporters Citi had terminated Ramchandani. The reports that Citi terminated Ramchandani left Feig "apoplectic." (Id.)

### 2. The DOJ Investigation

As alluded to above, UBS's self-reporting sparked a wide-ranging DOJ investigation into the FX market. UBS's report implicated Citi, among other banks, in the alleged collusive conduct. Also through UBS, the DOJ learned of the Chatroom and of Ramchandani's involvement.

The DOJ's FX investigation spanned from 2013 to 2018, involved at least four other banks besides Citi and UBS, six to seven currency pairs, including EUR/USD, delved into dozens of chatrooms other than the EUR/USD Chatroom, and

targeted several individual FX traders other than Ramchandani.

Citi cooperated with the DOJ investigation. The DOJ initially contacted Citi in the Fall of 2013. Citi and the DOJ exchanged over 200 communications and met numerous times throughout the course of the investigation, several meetings of which are notable.

In November 2014, Citi's lawyers from Cleary met with the DOJ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ █ ██████ ████ █ ███ ██████ █████. (See Fishman Decl., Ex. 12.) ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███ ████ ███ ████ █ ██ █████ █████ █ █

██████ ███████▟ █ █ █████ ████ ████████

████████████████████████████████████████████

██████ █████ ████ █████ █████ ██████ (Id. at GOV0008.) The DOJ's notes concluded that ████████

_____

[5] The DOJ's notes indicate a ████████████████████

████████████████████████████████████

(Fishman Decl., Ex. 12 at GOV0012.)

████ ███ ████ █████ █████ ██████ █████ █

████ █████ ██ ██████ (Id. at GOV0014.)

████████████████████████████████

████████████████████████████████

███████████████████████████, with

whom Cleary had entered into a joint defense agreement, ████

████████████████████████████████

████████████████████████████████

On or about March 9, 2015, Cleary again met with the DOJ. During that meeting, which was scheduled for the purpose of discussing Citi's potential plea, the DOJ ████████

████████████████████████████████

██████████████████████████ ██████

███████████.[6] The DOJ's notes of that meeting also reflected █████████████████████████████

████ ███ ████ ████ ████ ████ ████ █████

█████████████████████" (Fishman Decl., Ex. 15 at GOV0064.)[7] Carrie Syme ("Syme"), who would later play a major role in the prosecution of Ramchandani, wrote that ██████

---

[6] Citi also argued to the DOJ during this meeting ██████████████████ ██████████████.

[7] An exact transcription of the preceding quote from the record is ██████ ██████ (Fishman Decl., Ex. 15 at GOV0064.) The DOJ's notes, handwritten by Carrie Syme, an Assistant U.S. Attorney assigned to the investigation, include █████ ████████████████████████ (See Fishman Decl., Ex. 3, 51:21-23.)

███████████ ██████ ████ ████ ████ ████ ██████ ████ ██

███████████████████████████████████████████████████████

██████████████████████████████████████ (Id. at GOV0066.)

████ ███ ███ ████ █████ █████████ ████ ██

███████████████████████████████████████████████████████

██████████████████████████████████████ (Fishman Decl.,

Ex. 16 at GOV0072.) Citi's lawyers presented ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████

    On March 24, 2015, the DOJ █████████████████████████

███████████████████████████████████████████████████████

████████████████ At a high level, the DOJ ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████ ██ ██ ████ █████ ████ ██ ████ ████ ████ ████ ██

████ ████ ██ ███ █████ ████ ████ ████ ████ ██ ████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ The

DOJ expressed its view that ███ ██████ ██ ██ █████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

████  ██████  ██████████  ████  ████  ████  ████████  ████

████████  (Fishman Decl., Ex. 18 at GOV0016.)  The DOJ also

expressed ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████  (Id. at GOV0015.)

    In May 2015, the DOJ charged, and Citi pled guilty, via

a plea agreement (the "Plea Agreement"), to criminal

antitrust violations under the Sherman Act. (See Fishman

Decl., Ex. 19 ("Plea Agreement").) Citi's guilty plea was

limited to only the conduct associated with the EUR/USD

Chatroom and FX market. As noted above, Ramchandani was the

only Citi employee who participated in the Chatroom. Thus,

Citi had agreed to plead guilty to a corporate crime based on

Ramchandani's actions. The Plea Agreement stated that Citi

"and its co-conspirators entered into and engaged in a

combination and conspiracy to fix, stabilize, maintain

increase or decrease the price of, and rig bids and offers

for, the euro/U.S. dollar [] currency pair exchanged in the

foreign currency exchange spot market . . . by agreeing to

eliminate competition in the purchase and sale of the EUR/USD

currency pair." (Id. ¶¶ 2, 4.) UBS, Barclays, JPMorgan, and

RBS, each of which had an employee in the Chatroom, pled guilty to the same conduct as Citi.[8]

The Plea Agreement noted Citi's cooperation and assistance in identifying evidence related to the DOJ's FX investigation. Among that evidence, the Plea Agreement described "other relevant conduct" that Citi helped identify "in addition to" the EUR/USD currency pair. (Id. ¶ 13.) Citi was required to cooperate with the DOJ regarding not only the EUR/USD pair, but also "any other currency pair, in the FX Spot Market, or any foreign exchange forward." (Id. ¶ 14.) In exchange for Citi's guilty plea to the EUR/USD market conspiracy and further cooperation, the DOJ immunized Citi of all other potential criminal liability flowing from its FX investigation.

At sentencing, the DOJ's memorandum reflected that each of the banks charged with antitrust violations derived from the Chatroom provided "valuable assistance by explaining how the FX Spot Market operates, and by defining and decoding certain jargon traders use when describing their action in the market, sometimes via a line-by-line review of chat transcripts." (Citi 56.1 Stmt. ¶ 45.) Judge Underhill, in the District of Connecticut, who presided over the sentencing,

---

[8] UBS pleaded guilty to a breach of its non-prosecution agreement based on the same conduct as the other banks. (See Citi 56.1 Stmt. ¶ 39.)

"urge[d] the government to consider prosecution of individuals" involved in the underlying conduct but recognized that this was "obviously a decision for the government to make." (Greenberg Decl., Ex. SS, 26:12-27:15.) For Citi, that individual was Ramchandani, the sole Citi participant in the Chatroom. Citi paid a substantial fine in accord with its guilty plea.

   3.   The Indictment of Ramchandani

Ramchandani was indicted on January 10, 2017 by a grand jury sitting in the Southern District of New York. It indicted Ramchandani, Usher, and Ashton with one count of Conspiracy to Restrain Trade, a violation of 15 U.S.C. Section 1 (the "Indictment"). The Indictment charged Ramchandani, Usher, and Ashton with a conspiracy to "suppress and eliminate competition for the purchase and sale of EUR/USD in the United States and elsewhere." (Fishman Decl., Ex. 5 ¶ 18.) Ten prosecutors in the DOJ's Antitrust Division signed the Indictment, including Syme and Preet Bharara, who was then the United States Attorney for the Southern District of New York.

In securing the Indictment, the DOJ presented its case against Ramchandani and the other traders in the Chatroom to the grand jury. ██████████████████████████████████
██████████



(Fishman Decl., Ex. 23 at ECF 60, 44:10-13.)

(Id. at ECF 63, 47:17-22.)

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ At pre-trial hearings, Ramchandani's counsel
stated that it was Gardiner "who the government [] truly
relied on in terms of bringing [its] case." See <u>United States
v. Usher</u>, No. 17 Cr. 19 (S.D.N.Y. Mar. 26, 2018), Dkt. No. 93
(Hr'g Tr. 15:5-17). After Ramchandani failed to have the
indictment dismissed, the Court set a schedule for trial.

    4.    The Trial of Ramchandani

    Ramchandani, Usher, and Ashton were tried for criminal
antitrust violations before Southern District of New York
Judge Richard Berman. The trial began October 10, 2018. It
spanned approximately two weeks, and Gardiner was the DOJ's
star witness. He testified over the course of the trial, ███
███████████████████████████████, that he, Ramchandani, and the
other Chatroom members had an agreement to not trade to each
other's detriment, to share information openly and honestly,
and to help each other make profits and avoid losses. Gardiner
testified that the agreement was for the purpose of making
"money out of the[] fix[es]," and that the Chatroom members
coordinated their trading activities to do so. (Citi 56.1
Stmt. ¶ 83 (citing Fishman Decl., Ex. 7, 546:16-19).) Gardiner

again decoded the Chatroom messages for the jury. And although Citi witnesses testified, Ramchandani testified in this matter that none of Citi's witnesses decoded the Chatroom's messages at trial.

Gardiner's testimony, and the DOJ's reliance on it, failed to secure a conviction. Ramchandani's expert at trial testified that the use of interbank chatrooms was commonplace and often used to share market information and market color efficiently. Ramchandani's expert opined that the Chatroom members' use was consistent with how bankers used chatrooms. The defense also presented evidence that the Chatroom members' trades did not impact the FX market.

Ramchandani's argument was persuasive. On October 26, 2018, the jury acquitted Ramchandani, Usher, and Ashton of all charges.

B.  <u>PROCEDURAL HISTORY</u>

Ramchandani brought this action on October 2, 2019, alleging one count of malicious prosecution by Citi.[9] The parties then engaged in an exchange of pre-motion letters, pursuant to this Court's Individual Practices, regarding Citi's proposed motion to dismiss the complaint. (<u>See</u> Dkt. Nos. 19-23.) The Court assessed the letters exchanged as a

---

[9] Due to a filing error, Ramchandani's complaint was refiled on October 18, 2019. (<u>See</u> Dkt. No. 17.)

fully briefed motion to dismiss, and on the basis of those
letters, denied Citi's motion to dismiss.

In Ramchandani I, the Court found that Ramchandani had
adequately stated a claim for malicious prosecution. The
Court focused on the allegations regarding Citi's cooperation
with the DOJ. In ruling so, the Court construed the
allegations in the light most favorable to Ramchandani and
found that Citi had "identified and decoded" Ramchandani's
chats for the DOJ, and that there was a plausible inference
that "Citi had motive and opportunity to do more than merely
cooperate with the Government's investigation, but rather to
influence the outcome to serve its own interest in minimizing
its role in the underlying financial scheme and shifting blame
to another." Ramchandani I, 2021 WL 930627, at *7. Although
noting that it was a "close one" on the "thornier issue" of
whether "Citi's statements about Ramchandani to the DOJ were
knowingly false," the Court also found Ramchandani's
allegations sufficient. Id. This finding was based on the
plausible inference that "Citi told the DOJ that Ramchandani
had engaged in wrongdoing" despite the allegations that Citi
had not drawn any conclusions as to Ramchandani's conduct.
Id. at *8. Thus, the Court concluded that "when Citi told the
DOJ that Ramchandani had engaged in wrongdoing, it knew this
information was false and so acted in order to serve its

interest in minimizing liability and public exposure." Id.
The Court also found the other prongs of a malicious
prosecution claim had been adequately pled.

With its motion to dismiss denied, Citi filed its answer
to the complaint and the action proceeded into the discovery
phase. During the discovery phase, the parties raised
occasional issues about the underlying criminal action,
including the release and protection of the grand jury
transcript and associated materials and testimony from the
DOJ. These disputes, along with others, were referred to the
designated Magistrate Judge, Judge Aaron. Fact discovery was
then extended from the original schedule through July 2022.

Towards the end of the discovery period, and with some
significance to the instant Motion, Ramchandani moved to
compel disclosure of certain documents that Citi had withheld
as privileged. (See Dkt. Nos. 93-95.) The documents covered
three topics: (1) memoranda and emails regarding Citi's
meetings with the DOJ, (2) internal communications between
Citi's counsel at Cleary and Citi's internal PR personnel,
and (3) documents concerning Ramchandani's suspension and
termination. Citi opposed the motion to compel. Magistrate
Judge Aaron reviewed a subset of the documents in camera and
held a hearing on the dispute.

Magistrate Judge Aaron found, generally, that Citi had properly withheld the documents. The memoranda of meetings with the DOJ were attorney work product prepared by Cleary in anticipation of litigation. See Ramchandani v. Citi Nat'l Ass'n., No. 19 Civ. 9124 (SDA), 2022 WL 2156225, at *6 (S.D.N.Y. June 15, 2022). Because Ramchandani had access to the DOJ's notes of the same meetings, as well as other evidence, he could not establish a need for the work product as he already had substantially equivalent information. Id. Magistrate Judge Aaron also held that the emails between Citi's attorneys and the PR team were privileged. So, too, were the communications between Citi and its attorneys regarding Ramchandani's suspension and termination. Id. at *7-8. However, he found that portions of some documents were withheld improperly and ordered that they be partially or fully unredacted. Id.

At the close of discovery, per the Court's direction, Citi indicated its intent to move for summary judgment. After an exchange of letters on the anticipated motion, the Court directed the parties to propose a briefing schedule, which the Court adopted. That Motion is now fully briefed and ripe for resolution.

## II.  LEGAL STANDARD

In connection with a motion under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper if, viewing all the facts of the record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication." Samuels v. Mockry, 77 F.3d 34, 35 (2d Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986)). The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

The moving party bears the burden of proving that no genuine issue of material fact exists or that, because of the paucity of evidence presented by the nonmovant, no rational jury could find in favor of the nonmoving party. See Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48.

In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party, see Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

## III. **DISCUSSION**

This action requires the Court to assess a foundational question regarding corporate governance and cooperation with government inquiries: when does a bank's cooperation transgress the bounds of appropriate assistance and fall into the realm of scapegoating? The Court is persuaded that here, Citi has not teetered over the edge of that precipice. The undisputed evidence shows that Citi's provision of information was proper and not knowingly misleading, ████████ ████ ██████████ ████████ ████ ████████████ ████ ██ ██████ ██████████ ██████ ██ ██ . Accordingly, summary judgment for Citi is warranted.

As this Court stated at the motion to dismiss stage, the elements of a claim for malicious prosecution under New York law are "(1) the initiation of an action by the defendant against the plaintiff, (2) begun with malice, (3) without probable cause to believe it can succeed, (4) that ends in failure, or in other words, terminates in favor of the plaintiff." Ramchandani I, 2021 WL 930627, at *6 (quoting Cornejo v. Bell, 592 F.3d 121, 129 (2d Cir. 2010) (quotation omitted)). It is undisputed that the jury's acquittal of Ramchandani satisfies the fourth element. Thus, the Court focuses only on the first three.

A. INITIATION

Citi argues that the record does not show it initiated the prosecution of Ramchandani. The Court previously held that "[f]urnishing false information to law enforcement authorities is sufficient" to establish initiation. Id. (collecting New York law). Accordingly, that interpretation is law of the case and will be applied here. See Ali v. Mukasey, 529 F.3d 478, 490 (2d Cir. 2008) ("The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, the availability of

new evidence, or the need to correct a clear error or prevent manifest injustice.'").

To further clarify, for Citi, as a civilian, private defendant (i.e., not a law enforcement authority), "to be considered to have initiated the criminal proceeding, 'it must be shown [by Ramchandani] that [Citi] played an active role in the [DOJ's] prosecution, such as by giving advice and encouragement or importuning the authorities to act.'" Lupski v. County of Nassau, 32 A.D.3d 997, 998 (N.Y. App. Div. 2d Dep't 2006) (citation omitted). The word "initiation" is a slight misnomer. To satisfy the element, there is no exacting temporal requirement. Rather, the record must show that Citi played an outsized role in guiding the DOJ's hand towards a decision to prosecute Ramchandani. One way to satisfy that requirement is through the proffer of false information. But, "[m]erely giving false information to the authorities does not constitute initiation of the proceeding without an additional allegation or showing that, at the time the information was provided, [Citi] knew it to be false, yet still gave it to the [DOJ]." Id. (citations omitted); see also Stampf v. Long Island R. Co., 761 F.3d 192, 199-200 (2d Cir. 2014) ("Giving information to the police that is known to be false qualifies as the commencement of prosecution."); Bornschein v. Herman, 304 F. Supp. 3d 296, 302-03 (N.D.N.Y.

2018) ("[A] mistake does not support liability for malicious prosecution. . . . [the defendant must have] provided evidence or testimony which he knew to be misleading or perjurious.").

Citi argues that the undisputed record shows that it was UBS, not Citi, that initiated the DOJ's investigation into the FX Spot Market. Moreover,



In resisting summary judgment, Ramchandani argues that Citi made material misrepresentations to the DOJ that it knew were false. Ramchandani's argument is premised on Citi identifying Ramchandani as a "wrongdoer" in both the press and in meetings with the DOJ, and on Feig's decoding of the chat transcripts, which he contends were done "in a knowingly misleading manner." (Opp. at 20.) Further, and in combination with its alleged knowingly false statements, because Citi agreed to plead guilty to *only* the conduct involving the EUR/USD currency pair, it effectively served Ramchandani on a platter for prosecution by the DOJ.

The undisputed record establishes that Citi did not "initiate" the prosecution of Ramchandani. To begin, it is undisputed that UBS's voluntary self-reporting is what brought the EUR/USD Chatroom conduct to the DOJ's attention.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ (Citi 56.1 Stmt. ¶ 10.) Ramchandani's deposition testimony corroborated this fact, stating that it was his "recollection" that "it was UBS" which had brought the Chatroom's attention to the DOJ, not Citi. (Fishman Decl., Ex. 6, 57:17-24.)

Citi's cooperation with the DOJ by decoding the chats does not establish that it initiated the prosecution. Ramchandani argues that Feig, as "Citi's chief 'decoder'" "provided knowingly misleading characterizations of Ramchandani's chatroom activities" which the DOJ then adopted, wholesale, to indict Ramchandani, without allowing Ramchandani to offer his own exculpatory decoding of the chats. (Opp. at 20.)

Ramchandani points to one particular chat, from September 8, 2010, which he posits proves that Feig provided the DOJ with knowingly misleading information. Feig described that chat as showing Ramchandani coordinating with Usher to trade against another Citi trader, Simon Jones ("Jones").

Feig testified to that interpretation. He said that Usher had
asked Ramchandani "for the details of [Jones's] position.
[Ramchandani] gave it to [Usher] and made a comment that
[Ramchandani] hoped that [Usher] would squash [Jones], [that]
[Usher] would squash the Citi trader." (Greenberg Decl., Ex.
B, 58:21-25.) But, Ramchandani asserts that Feig knew this
statement was false because Usher never traded to "squash"
Jones. Further, Ramchandani presents an affidavit from Jones,
which Jones says shows that Feig knew his description of this
chat was false.[10]

As Jones tells it, Feig had no problem with Ramchandani's
conduct. Feig talked to Jones and joked with him about a chat
between Jones and Ramchandani, commenting "how funny he found
the exchange as [Jones] was 'so mad' with [Ramchandani]," and
that, at this point Feig was "not characterizing what occurred
as being against Citi's interests." (Id. Ex. Q ¶ 23.) Then,
after Ramchandani had been terminated, Feig reapproached
Jones to tell him that Ramchandani's chat with Usher about

---

[10] Citi objects to the inclusion of the Jones Affidavit as evidence because
Ramchandani failed to identify Jones on his initial disclosures and seeks
to have the affidavit struck pursuant to Federal Rules of Civil Procedure
26(a)(1), (e), and 37(c). (See Reply at 10 n.13.) The Court acknowledges
the validity of Citi's objection but finds that the Jones Affidavit is
largely irrelevant and does not support the proposition for which
Ramchandani offers it. The Court is not persuaded that Citi would be
prejudiced by the Court reviewing the Jones Affidavit as part of the
summary judgment record.

Jones "was one of the reasons for Ramchandani's termination."
(Id. ¶ 25-26.)

The Jones Affidavit suffers from several flaws. First,
Jones's recounting of what Feig told him is hearsay and the
record before the Court does not indicate whether Feig had
been deposed on this conversation. Cf. Abdel-Karim v.
EgyptAir Airlines, 116 F. Supp. 3d 389, 409 (S.D.N.Y. 2015)
("A party 'cannot rely on inadmissible hearsay in opposing a
motion for summary judgment . . . absent a showing that
admissible evidence will be available at trial."). While Feig
could testify at trial to "shar[ing] a laugh over [the chat]"
with Jones, the chat that Jones is describing is not the same
chat that Feig decoded for the DOJ. Rather, the Jones
Affidavit establishes that the chat Feig found humorous was
a chat between Jones and Ramchandani, where Ramchandani
chided Jones for his poor execution of the trade, not the
chat between Ramchandani and Usher.

It is clear from Jones's retelling that Jones was not
even aware of the Chatroom chat at issue until after
Ramchandani was terminated. (Greenberg Decl., Ex. Q ¶¶ 24
(noting that at the time Ramchandani was suspended, Jones was
"not aware that Citibank considered the [chat with Usher] to
be an episode of any consequence"), 25-26 (explaining that
after Ramchandani was terminated, Feig told Jones for the

first time about the chat with Usher and how "Ramchandani was
in an external chatroom prior to [Jones's] trade telling
others to take advantage of me").) Jones's affidavit does not
create a dispute of material fact as to whether Feig genuinely
believed his interpretation of the chat between Ramchandani
and Usher was correct at the time he decoded it to Citi's
lawyers. The record shows he believed his interpretations
were accurate. (See, e.g., Greenberg Decl., Ex. B, 55:12-16.)
Nor does it undermine Feig's belief that the chat served as
a basis for terminating Ramchandani. (Id. Ex. YY at 1.) Even
Jones's apparent shock with Feig's actions in terminating
Ramchandani says nothing about Feig's views. More to the point
though, while the chat between Ramchandani and Usher about
Jones may have been a predicate for Ramchandani's dismissal,
the record shows that it was not the only chat that either
Feig or the DOJ reviewed. And, critically, Feig's decoding of
the chat, as a matter of strict textual interpretation,
appears accurate even if, in context, Usher did not trade
against Jones.

Either way, Feig's undisputed testimony tells the
opposite story from Ramchandani's. When asked at his
deposition if he ever "mischaracterize[d] any of the chat
room communications [he] w[as] reviewing," Feig responded
that he "did not mischaracterize certainly intentionally."

(Greenberg Decl., Ex. B, 55:12-16.) And, much later on, in 2019, Feig emailed Ramchandani and reiterated that "[f]rom everything I saw and heard there was rationale to dismiss you. However, as we agreed, I had never had the opportunity to hear you explain the chats." (Id. Ex. YY at 1.) This testimony and evidence firmly establish that Feig, at the time, believed his interpretations were correct (even if Ramchandani did not) and thus did not knowingly provide false information to or knowingly mislead the DOJ.

There is also no evidence in the record, other than Ramchandani's speculation, that Feig had the motive to provide false information to save his own skin. (See Opp. at 4 ("Feig himself was at obvious risk of being sanctioned by Citi or law enforcement authorities. Therefore, Feig had a strong interest in blaming Ramchandani.").) The deposition testimony that Ramchandani cites in support of this proposition (id. (citing Greenberg Decl., Ex. B, 17:18-18:12; 12:12-17)) does not indicate that Feig sought to sacrifice Ramchandani. Instead, it shows only an awareness by Feig that the Chatroom chats were recorded and could have been subject to compliance checks. Speculation alone does not raise a genuine dispute of material fact for purposes of summary judgment. See D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cit. 1998) (party opposing summary judgment may not "rely

on mere conclusory allegations nor speculation"). And further, in Feig's 2019 email to Ramchandani, he disclaims any ill-intent, confirming to Ramchandani that he "didn't think [Ramchandani] had committed any anti-trust violations nor did [he] think, as they [the DOJ] tried to convince [him], that [Ramchandani] had intent to commit anti trust [sic] violations." (Greenberg Decl., Ex. YY at 1.) The evidence thus shows that at that time Feig was on Ramchandani's side.

Ramchandani also points to the fact that Feig and others at Citi labeled Ramchandani a "wrongdoer" to the DOJ. In making this argument, Ramchandani gloms together two different types of wrongdoing: (1) wrongdoing that violated Citi's internal policies; and (2) criminal wrongdoing. The record establishes, however, that ████████████████████████████████████████. Time and again, Citi ████████████████████████████████████████████████████████████████████████████.

The stipulation entered between Ramchandani (signed by his attorneys at WilmerHale) and the Office of the Comptroller of the Currency ("OCC") ████████████████████████ ████████████████████████████████████████ (See generally Fishman Decl., Ex. 17.) For example, at a meeting on June 11, 2014, between Cleary and the DOJ, █████████

30



████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ (Id. at 2.) Further, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ (Id. at 4.) ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██ ██ ██ ██ ████ ████ █ ██ ██ ██████

████████████████████████████████████████████████

████████████████ (Id. at 10.)

███ ██ ██ █████ ██ ████ ████ ██ █████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ (Id.) █

███ ██ ██ ███ ████ █████ ████ █████ ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ (Id. at 11.) ████████████

████████████████████████████ ████ ████

██████████████████████ ██ ████████████



At another meeting on November 12, 2014 ▮▮▮▮▮▮

(Id. at 12.)

(Id.)

(Id.) Citi then explained ▮▮▮▮▮

(Id.) To the extent that New York law requires Ramchandani to establish that Citi induced the DOJ to prosecute -- see Lupski, 32 A.D.3d at 998 ("The defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition.") -- ▮▮

(Fishman Decl., Ex. 17 at 13.)

, at the March 9, 2015

meeting with the DOJ, ███████████████████████████████

███████████████████████████████████████████████████

██ ██ ███ ███ ███ ██ ██ ██████ ██

███████████████████████████ (Id. at 18.)

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██ ██ ███ ███ ███ ██ ███ (Id.) ███

███ ███ ██ ███ ██ ██ ███ ███

███████████████████████████████████████████████████

██ ███ █████ ███ ██ ███ ███

███████████████████████████████████████████████████

████████████████████████ (Fishman Decl., Ex. 16 at

GOV0070, 0072.) ███████████████████████████

██ ███ ██ ███ ███ ███ ███ ██ █

██████████████████████████████ (Fishman

Decl., Ex. 15 at GOV0064.)

And insofar as Ramchandani contends that Citi singled

him out as the sole wrongdoer, that conclusion also is belied

by the undisputed evidence in the record. Indeed, the Court

noted that it was a close call at the motion to dismiss stage

as to whether Citi's plea agreement with the DOJ and

sentencing memorandum, referencing "one of its traders" and

"one Citi employee . . . based in London," was sufficient to establish the initiation prong. See Ramchandani I, 2021 WL 930627, at *7. But the undisputed evidence now on a fuller evidentiary record shows 

(Fishman Decl., Ex. 17 at 19.)

Ramchandani does not raise a dispute of material fact sufficient to overcome Citi's Motion that the DOJ (not Citi) was the party primarily focused on the EUR/USD Chatroom and thus on Ramchandani. ████ ████ █████████ ██ █████████

(Id. at 23.) Citi did, eventually, plead guilty to conduct originating from the EUR/USD Chatroom. ████████████████████████████

That Citi pled guilty based on only Ramchandani's conduct, agreed to focus on the EUR/USD currency pair, and cooperated with respect to Ramchandani does not, as Ramchandani posits, establish a sinister motive. Rather, the

evidence of the negotiations leading up to Citi's entry into the Plea Agreement establishes that it was "carefully negotiated . . . so as to limit [Citi's] admissions to narrowly specified conduct." <u>Kaplan v. S.A.C. Cap. Advisors, L.P.</u>, 104 F. Supp. 3d 384, 391 (S.D.N.Y. 2015) (VM). Further, it is this Court's experience that, in reaching a plea deal, defendants often home in on the conduct for which they believe they are least culpable. And that is what Citi apparently thought as to the EUR/USD currency pair and Chatroom. So, in contrast to Ramchandani's position that Citi sought to make him the scapegoat, the undisputed evidence shows that, to the extent that Citi (not the DOJ) affirmatively sought to focus on the EUR/USD currency pair, it was because Citi believed no crime based on Ramchandani's conduct had occurred, and that it was best positioned to protect its and Ramchandani's interests by reaching a non-criminal resolution to the conduct. And, in doing so, Citi would commit to helping the DOJ prosecute other individuals, including Christopher Cummins ("Cummins"), a former Citi FX trader focused on currencies from Central and Eastern Europe, the Middle East, and Africa, and who would plead guilty to antitrust violations. (<u>See</u> Greenberg Decl., Ex. BB.)[11]

---

[11] Cummins reached a plea deal with the DOJ and was sentenced to time served, two years supervised release, and a $20,000 fine. <u>See</u> Judgment in

Ramchandani also points to a statement by a Cleary lawyer, Mark Nelson, appearing in an affidavit from one of Ramchandani's criminal defense lawyers, Thomas Mueller. In that affidavit, Mueller says that Nelson told him "that Ramchandani was 'collateral damage' from Citi's plea agreement." (Greenberg Decl., Ex. PP ¶ 7.) Ramchandani says that this was an admission that "Citi had agreed to a charge based upon false claims of criminal conduct by Ramchandani." (Opp. at 14.) To the extent that this statement is admissible, Ramchandani fails to show how this establishes a genuine issue of material fact as to the initiation element. It is clear from ▮▮▮▮▮▮▮▮, and corroborated by Nelson, that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (See Greenberg Decl., Ex. PP ¶ 8 ("Nelson reiterated that there was no basis for bringing *per se* price fixing charge under the Sherman Act against Citi arising out of Ramchandani's conduct.").)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮ ▮ ▮▮ ▮ ▮▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ The Court is aware of no binding precedent (and Ramchandani cites none) that suggests a

---

a Criminal Case, <u>United States v. Cummins</u>, No. 17 Cr. 00026 (S.D.N.Y. Oct. 22, 2020), Dkt. No. 30.

corporation pleading guilty to conduct it did not believe was criminal is equal to providing knowingly false information or misleading testimony to prosecutors. Rather, the evidence indicates that ███ ███ ███ ████████████ ██████ ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

But that finding does not constitute the full story. There was information asymmetry between the DOJ and Citi, as Citi was not the only bank providing the DOJ with evidence. This asymmetry created a significant risk/benefit problem for Citi if it continued to hold its position that its and Ramchandani's conduct was not criminal. The DOJ told Citi that ██████████████████████████████████████████

████████████████████████████████ (Fishman Decl., Ex. 17 at 13.) ██████████████████████████████████

████████████████████████████████████████████████████

███████████

Insofar as Ramchandani was "collateral damage" flowing from that decision, it was not due to Citi's choice, but rather to the DOJ's independent assessment of the evidence and its then-existing policies. The DOJ, since at least 2015, had announced a policy that, "[i]n the white-collar context, [] mean[t] pursuing not just corporate entities, but also the

individuals through which these corporations act." (Greenberg
Decl., Ex. LL at 2 (quoting Sally Q. Yates, Deputy Att'y Gen.,
Dep't of Justice, Remarks at NYU School of Law Announcing New
Policy on Individual Liability in Matters of Corporate
Wrongdoing (Sept. 10, 2015)).) ███████████████████

███████████████████████████████████

██████████ ████ ████████ ████ ██████ ▌ ███

██████ ████ ████ ██████ ████████ ██ ██████ ███

██████ <u>Cf.</u> <u>Lupski</u>, 32 A.D.3d at 998 ("[I]t must be shown
that defendant played an active role in the prosecution, such
as giving advice and encouragement or importuning the
authorities to act.") (citation omitted).



███████████ ██████ ██████ █ ████ █ █████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████ ████ ███ ████ ████ ██████ ████ ████████

Ramchandani's theory here fails to mount the "heavy burden
[placed] on malicious prosecution plaintiffs." <u>Smith-Hunter</u>
<u>v. Harvey</u>, 734 N.E.2d 750, 752 (N.Y. 2000).

Ramchandani offers another premise. He plots a theory
that Citi's PR strategy to identify him as a "wrongdoer" in
the media raises a genuine dispute of material fact on the
initiation prong. Ramchandani fails to connect his dots. He

does not explain how giving information to the media is the
same as giving false information to law enforcement
authorities. And while Ramchandani argues that this strategy
was part of an "early plan formulated by Citi and its counsel
to focus the FX investigation on Ramchandani," the only
evidence Ramchandani can muster in support of this contention
consists of email subject lines from "hundreds of emails in
2013, withheld on privilege grounds, specifically dealing
with Citi's investigations of Ramchandani and P.R. strategy."
(Opp. at 3.)

While the Court must draw reasonable inferences in
Ramchandani's favor as the non-movant, Ramchandani's request
here seeks something different and unjustifiable. He invites
the Court to draw a negative inference from Citi's invocation
of the attorney-client privilege -- one which the Court has
already deemed was proper. See generally Ramchandani, 2022 WL
2156225 (denying Ramchandani's motion to compel disclosure of
documents withheld on privilege grounds between Citi's
attorneys and public relations team). The Court must decline
Ramchandani's invitation. Courts should not draw negative
inferences from a party's application of the attorney-client
privilege to withhold discovery. Doing so would have
"seriously harmful consequences" to the purpose underlying
the privilege, discouraging the open exchange of information

and advice between clients and their attorneys. <u>Nabisco, Inc.</u> <u>v. PF Brands, Inc.</u>, 191 F.3d 208, 226 (2d Cir. 1999), <u>abrogated on other grounds by</u> <u>Moseley v. V Secret Catalogue,</u> <u>Inc.</u>, 537 U.S. 418 (2003) ("We know of no precedent supporting such a[ negative] inference based on the invocation of the attorney-client privilege. This privilege is designed to encourage persons to seek legal advice, and lawyers to give candid advice, all without adverse effect."); <u>see also</u> <u>In re:</u> <u>Gen. Motors LLC Ignition Switch Litig.</u>, No. 14-MD-2543, 2015 WL 8130449, at *3 (S.D.N.Y. Dec. 3, 2015) (party could not "invoke [] privilege assertions in this MDL to encourage the jury to draw an adverse inference from those assertions").

Even more critically, none of Ramchandani's evidence establishes that Citi's PR team labeled him a wrongdoer, let alone a criminal wrongdoer, in the press. The emails offered merely show that Citi confirmed it had taken employment action with respect to Ramchandani.

None of Ramchandani's evidence or arguments raise a sufficient dispute of material fact. Thus, Citi is entitled to summary judgment in its favor as to the initiation prong of Ramchandani's malicious prosecution claim.

B.   <u>PROBABLE CAUSE</u>

Ramchandani also fails to raise a dispute of material fact on the probable cause element of his malicious

prosecution claim. From the start, Ramchandani had a large hurdle to jump: "[o]nce a suspect has been indicted . . . the law holds that the Grand Jury action creates a presumption of probable cause." Rothstein v. Carriere, 373 F.3d 275, 282-83 (2d Cir. 2004) (quoting Colon v. City of New York, 455 N.E.2d 1248, 1250 (N.Y. 1983)). This presumption "is founded on the premise that the Grand Jury acts judicially and it may be presumed it has acted regularly." Colon, 455 N.E.2d at 1250. To scale this hurdle, Ramchandani needed to raise a dispute of genuine material fact by "evidence establishing that the police witnesses [(here, Citi)] have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, [or] that they have withheld evidence or otherwise acted in bad faith." Id. at 1250-51 (collecting cases). In other words, once indicted, Ramchandani "must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Id. at 1251; see also Richards v. City of New York, No. 97 Civ. 7990, 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003) ("New York law thus strips an indictment of its presumptive force in a malicious prosecution action when the indictment was obtained through improper means.").

Ramchandani cannot make, and has not made, such a showing. Ramchandani bases his argument largely on the same facts underlying his initiation claim, that Citi provided knowingly false information (mainly Feig's decoding of the chats) to the DOJ, which then adopted Citi's interpretations and repeated them to the grand jury. Ramchandani again points to the fact that no one from Citi believed that Ramchandani had committed a crime as proof that Citi representatives knew what they communicated to the DOJ was false. (See Opp. at 23.) Essentially, Ramchandani contends that Citi's false decoding of the chats tainted the DOJ's presentation to the grand jury.

At the motion to dismiss stage, the Court allowed the claims to proceed based on the plausibility of Ramchandani's allegations. Those allegations were (1) that "Citi mischaracterized his chatroom communications and told the DOJ he was criminally liable for price-fixing based on those communications"; and (2) "[t]hat the DOJ could not decode the chats without Citi's assistance," making it plausible "that the indictment was 'procured' based on Citi's false statements." Ramchandani I, 2021 WL 930627, at *9.

The fuller, undisputed evidentiary record now shows that those allegations were unsupported. As previously discussed, there is no evidence that Citi mischaracterized the chatroom

communications. Feig explicitly disclaimed any knowing mischaracterization of his decoding, and the DOJ's notes emphasized their disagreement with Citi's interpretations. (See, e.g., Fishman Decl., Ex. 16 at GOV0070 ███████████████

███████████████████████████████████████

███████████████████████████████, GOV0071 ██████████████

████████████████████, GOV0072 ███████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████; see also id. Ex. 3 (Syme Dep.) 78:3-11 ██████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████.)

███████████████████████████████████████

███████████████████████████████████████

███████

    The allegation that Citi told the DOJ that Ramchandani is criminally liable is also without support. As detailed at length above, ████████████████████████████████████

████████  ████████  ███████  ████  ████  ████  ████

█████████  ███████████  ██████████  ████  █████  ████

43

████████████████████████████████████████

███████████████████   █████   █████████████

     Finally, while Feig assisted the DOJ in decoding the chats, he was not the only one who did so. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████   The DOJ was assisted by the three other banks that pled guilty to the FX conduct, each of which "explain[ed] how the FX Spot Market operates, and [] defin[ed] and decod[ed] certain jargon traders' use when describing their actions in the market, sometimes via a line-by-line review of chat transcripts." (Citi 56.1 Stmt. ¶ 45.) Ramchandani admits this fact without objection. (See Ramchandani 56.1 CS, Response to ¶ 45 ("Admitted.").) ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

     Further, even if it was sufficient under New York law for the mere transmission of false facts to a prosecutor to

overcome the presumption of probable cause, the Second Circuit has clarified that once the grand jury has indicted, Ramchandani was "required to rebut that presumption by proving fraud, perjury, suppression of evidence or other misconduct *in the grand jury*." Rothstein, 373 F.3d at 283 (finding error in the district court's decision that, "[i]f in fact a person tells the police so and so is guilty of a felony and he maliciously lies about that, it doesn't matter what goes on before the grand jury" because the "cause of action is for malicious *prosecution*, not for maliciously making false statements to law enforcement authorities"). If Citi's decoding of the Chatroom chats were false and misleading (and it is not), it remains undisputed ███████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ Indeed, three other banks provided their own interpretations of the chats to the DOJ.

Ramchandani also conceded at his deposition that his claims are not based upon misconduct or fraud before the grand jury. (See Citi 56.1 Stmt. ¶ 77.) To survive summary judgment on this element, Ramchandani needed to make a showing of fraud or misconduct before the grand jury to overcome the

presumption of probable cause. "His failure even to attempt to make that showing requires dismissal of his claim." Rothstein, 373 F.3d at 283.

    C.   MALICE

Ramchandani also fails to create a genuine dispute of material fact as to the malice standard. He bases his claim on much of the same arguments detailed above: Citi's supposed "improper motive" in agreeing to plead guilty to only the EUR/USD Chatroom conduct to the detriment of Ramchandani alone. (See Opp. at 24-25.) But as discussed above, the evidence does not support the notion that Citi's motive was improper. And Citi did not single out Ramchandani. As previously noted, Citi's plea agreement required it to cooperate with the DOJ regarding several other individuals involved in other currency pairs and other chatrooms, including Cummins, and Citi took employment action on 17 traders.

Moreover, Citi assisted Ramchandani in his defense. Citi provided Ramchandani with individual counsel and entered into a joint defense agreement with them to facilitate information sharing. The undisputed record also shows that ████

████████████████████████████████████████

████████████████████████████

Nor does the evidence show that Citi orchestrated a PR strategy to scapegoat Ramchandani. The emails produced on this topic, not subject to privilege, show that it was the reporters, not Citi's PR personnel, who went beyond the scope of Citi's confirmation that Ramchandani was no longer employed by the bank. (Compare Greenberg Decl., Ex. L at 1 ("[Feig] told Ramchandani that we would not be telling press he was fired, that we would be confirming he's no longer with the company."), with Ex. X ("I said he no longer works here and told them to use the word "confirmed.").) None of the emails between Citi's PR team show that Citi labeled Ramchandani as a criminal wrongdoer in the press. (See Id. Exs. L, M, N, W, & X.) And, as noted above, the Court will not draw a negative inference from the other documents withheld for privilege. Accordingly, Citi is entitled to summary judgment on the malice element, too.

\* \* \* \* \*

As previewed earlier, Ramchandani's position raises a complicated policy issue regarding the boundary between cooperation with regulatory investigations and the identification, whether malicious or not, of the individuals through whom corporations act. Ramchandani seeks to hold accountable a corporation he believes went outside of the bounds of acceptable assistance, sought to deflect its own

potential culpability, and attempted to pin the blame entirely on him. There certainly could be circumstances where such a threshold is crossed. This case is not one of them.

Just as courts should seek to protect individual whistleblowers who call out corporate malfeasance, so too should they be wary to fashion a rule that may discourage corporations from self-disclosing and actively cooperating with the government to root out wrong-doing and wrong-doers. The undisputed record here shows that Citi toed that line appropriately and so Ramchandani's malicious prosecution claim fails. Citi is accordingly entitled to summary judgment.

## IV. <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 144) pursuant to Rule 56 of the Federal Rules of Civil Procedure by defendants CitiBank National Association, CitiGroup Inc., and Citicorp (together, "Citi") for summary judgment and dismissal with prejudice of the complaint (Dkt. No. 1) brought by plaintiff Rohan Ramchandani ("Ramchandani") is **GRANTED.** The case is **DISMISSED.** The Clerk of the Court is respectfully directed to terminate the motion pending at Dkt. No. 144 and to close the case.

In accord with the Court's previous orders regarding the sealing of the confidential information in the summary judgment record, see Note 1 above, the Clerk of Court is also respectfully directed to file this Decision and Order ("D&O" or "Order") under seal, restricting viewing levels to only Ramchandani, Citi, and the Court. The parties are directed to jointly submit proposed redactions to the D&O within seven (7) days of the date of the Order.


**SO ORDERED.**

Dated:     19 July 2023
           New York, New York

                                    _____
                                         Victor Marrero
                                            U.S.D.J.